


UNITED STATES COURT
OF FEDERAL CLAIMS

SHERWYN ZEPHIER,
ADELE ZEPHIER, RODERICA
ROUSE, LLOYD B. ONE STAR,
EDNA LITTLE ELK, CHRISTINE
MEDICINE HORN and LOIS L. LONG,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMARLY SITUATED,

      Plaintiffs,

vs.

UNITED STATES OF AMERICA,

      Defendant.

_____/

CASE NO:

03- 768L

CLASS ACTION

## COMPLAINT

Plaintiffs, Sherwyn Zephier, Adele Zephier, Roderica Rouse, Lloyd B. One Star, Edna Little Elk, Christine Medicine Horn and Lois L. Long, individually and on behalf of all others similarly situated, by and through undersigned counsel, bring this Complaint against the United States of America, and state as follows:

### Parties and Jurisdiction

1.     Plaintiff, Sherwyn Zephier, is a citizen of the United States and a member of the Sioux Nation.

2.     Plaintiff, Adele Zephier, is a citizen of the United States and a member of the Sioux Nation.

Zephier, et al. v. United States of America
Complaint

3.  Plaintiff, Lloyd B. One Star, is a citizen of the United States and a member of the Sioux Nation.

4.  Plaintiff, Roderica Rouse, is a citizen of the United States and a member of the Sioux Nation.

5.  Plaintiff, Edna Little Elk, is a citizen of the United States and a member of the Sioux Nation.

6.  Plaintiff, Christine Medicine Horn, is a citizen of the United States and a member of the Sioux Nation.

7.  Plaintiff, Lois L. Long, is a citizen of the United States and a member of the Sioux Nation.

8.  This Court has subject matter jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), as the claims set forth herein are founded in the Constitution, or an Act of Congress, or regulation of the executive department, or upon express or implied contract with the United States, for unliquidated damages not sounding in tort, including Treaties described herein, and the trust obligations of the United States to Native Americans and their children set forth in the 1787 Northwest Ordinance, the Indian Appropriations Act of 1891, 25 U.S.C. §271 et seq., and 25 C.F.R. Part 31.

9.  Plaintiffs seek damages in this action for the class against the United States in the amount of $25 billion.

## General Allegations

10. The United States was involved in the education of Native Americans from the very

Zephier, et al. v. United States of America
Complaint

beginning of the Country's creation. Through various treaties and laws (including a number of Congressional Acts), the United States made Native Americans wards of the federal government, and undertook a fiduciary duty to educate and care for Native American children.

11.     On July 13, 1787, Congress passed the Northwest Ordinance, which stated in Article the Third:

> Religion, Morality and knowledge being necessary to good government and the happiness of mankind, Schools and the means of education shall forever be encouraged. The utmost good faith shall always be observed towards the Indians, their lands and property shall never be taken from them without their consent; and in their property, *rights and liberty*, they never shall be invaded or disturbed, unless in just and lawful wars authori[z]ed by Congress." (Italics added)

12.     In various treaties signed by the United States and ratified by Congress, the federal government mandated that Native Americans attend "American" schools. Many of these treaties contain a "Bad Man" clause wherein the United States is contractually bound to compensate Native Americans for any damages sustained, regardless of liability, for harm caused by a non-Native American. The "Bad Man" clause typically is stated as follows:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agency and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also to **reimburse the injured persons for the loss sustained**. (emphasis added)

13.     The "Bad Man" clauses appear in the following Treaties: Treaty with the Sioux Indians of 1868, 15 Stats. 635; Treaty with the Arapaho Indians of 1868, 15 Stats. 635; Treaty with the Navajo Indians of 1868, 15 Stats. 667; Treaty with the Eastern Band Shoshoni and Bannock

Zephier, et al. v. United States of America
Complaint

Indians of 1868, 15 Stats. 673; Treaty with the Ute Indians of 1868, 15 Stats. 619; Treaty with the Northern Cheyenne and Arapaho Indians of 1868, 15 Stats. 655; and Treaty with the Crows Indians of 1868, 15 Stats. 649.

14. Initially, missionaries attempted to educate Native Americans. Beginning in the late 19th century, the United States undertook and assumed direct responsibility for the education of Native Americans in what became known as the "Indian Boarding School" system. In 1870, Congress authorized an appropriation to set up and fund the Indian Boarding Schools. The Bureau of Indian Affairs, an executive agency in the Department of the Interior ("BIA") was responsible for disbursement of these funds and management of the Indian Boarding School system. The BIA either directly or in conjunction and partnership with various Churches operated and controlled the Indian Boarding Schools.

15. What followed was a system of heinous abuse and genocide perpetrated upon Native Americans by the United States which lasted until the late twentieth century.

16. In the 19th century, Indian policy was dictated by the concept of "Manifest Destiny" which embodied the imperialistic idea that white Americans had a divine right to take possession of all land in the continental United States and its fruits. Under the prevailing majority view, which was reflected in United States policy, Native Americans were viewed as culturally and socially inferior to white Americans. On the basis of Manifest Destiny, Native Americans were forcibly and violently driven from their lands through the United States' exercise of plenary power.

17. After breaking numerous treaties, seizing Indian lands, and destroying Native economies, the United States intended the Indian Boarding School system as the final element in

Zephier, et al. v. United States of America
Complaint

the destruction of the Native American Tribes. The objective was the total assimilation of indigenous peoples and the obliteration of their native cultures. Many educators of Native Americans, as well as the BIA, actually believed in the idea that they had to "kill the Indian, save the man".

18. Native American children were forcibly removed from their homes and families to attend Indian Boarding Schools. BIA agents barged into the homes of Native Americans and dragged their children away from their families in order to assimilate them into "white society".

19. Indirect means were also used to coerce enrollment in the Boarding Schools. In 1891, Congress passed the Indian Appropriations Act, which required all Native American children to attend school and authorized the Bureau of Indian Affairs to withhold federal rations from any Indian family who refused to send their children away to school. Families were essentially starved to force the conscription of their Indian children to the Boarding Schools.

20. At the Indian Boarding Schools, children were subjected to numerous forms of abuse and atrocities. These atrocities committed against Native American children included sexual abuse, mental and psychological abuse, and physical abuse.

21. After being taken from their families, Native American children (typically around six years old) were stripped of everything "Indian". Braids were cut and their clothing was "Americanized". Children were beaten if they were caught with medicine bundles or otherwise practiced any element of their native culture.

22. Native American children were forced to speak English. If the children spoke their tribal languages they were forced to eat lye soap and typically beaten.

Zephier, et al. v. United States of America
Complaint

23. Native American children were stripped of their family life, family values, religious beliefs and culture. The methods of "educating" Native American children were typically violent and humiliating.

24. The abuse was facilitated by the BIA's policy of isolation. Parents and family members were not given any access to children, and children were otherwise prevented from communicating with their families.

25. Native American children were in some cases murdered at the Indian Boarding Schools with no repercussions for the perpetrators. Essentially, the "educators" at the Boarding Schools had carte blanche authority to commit acts of violence and abuse against Indian children.

26. The abuse most frequently and typically occurred at young ages, 6 to 10, when the children first arrived at the Boarding Schools and were "broken in." The physical beatings and sexual abuse were justified by school teachers, administrators and officials as a mean to "send the devil out" of the Native American children.

27. Students who cried from homesickness were often beaten, and those who attempted to run away were often chained in makeshift jails, such as an attic or closet, as punishment. All of the acts of abuse committed upon the Native American children were carried out to accomplish the United States' objective of assimilating the "savage beast" to the white man's way of life by the destruction of all things Indian.

28. The BIA had control of the Indian Boarding Schools established under its auspices, and was well aware of the foregoing atrocities taking place as a matter of course at the Boarding Schools. The BIA was instrumental, directly and indirectly, in conscripting children to the Indian

Zephier, et al. v. United States of America
Complaint

Boarding Schools knowing that they would be physically, psychologically and sexually abused at the Schools.

29. Kevin Gover, the Assistant Secretary - Indian Affairs, Department of the Interior, made the following statements and admissions on the BIA's acts and omissions regarding the Indian Board Schools:

> After the devastation of tribal economies and the deliberate creation of tribal dependence on the services provided by this agency, this agency set out to destroy all things Indian. This agency forbade the speaking of Indian languages, prohibited the conduct of traditional religious activities, outlawed traditional government, and made Indian people ashamed of who they were. Worst of all, the Bureau of Indian Affairs committed these acts against the children entrusted to its boarding schools, brutalizing them emotionally, psychologically, physically and spiritually. Even in this era of self-determination, when the Bureau of Indian Affairs is at long last serving as an advocate for Indian people in an atmosphere of mutual respect, the legacy of these misdeeds haunts us. The trauma of shame, fear and anger has passed from one generation to the next, and manifests itself in the rampant alcoholism, drug abuse and domestic violence that plague Indian country. Many of our people live lives of unrelenting tragedy as Indian families suffer the ruin of lives by alcoholism. Suicides made of shame and despair, and violent death at the hands of one another. So many of the maladies suffered today in Indian country result from the failures of this agency. Poverty, ignorance, and disease have been the product of this agency's work.

30. In 1978, Congress passed the Indian Child Welfare Act which brought about the end of the federal government's policy of forcibly transferring native American children to Indian Boarding Schools. Even after the 1978 Act, however, Indian Boarding Schools continued to operate and exist even today.

Zephier, et al. v. United States of America
Complaint

## Class Action Allegations

31. This action is brought by Plaintiffs as a class action, on their own behalf and on behalf of all others similarly situated, under RCFC 23.

32. The class represented by Plaintiffs, of which each Plaintiff is a member, consists of all persons, or their executors and heirs, who were sexually, physically or mentally abused at Indian Boarding Schools operated under the authority and auspices of the Bureau of Indian Affairs in the years 1890 to present. The class members were beneficiaries of "Bad Man" clauses under one or more Treaties with the United States.

33. It is estimated that hundreds of thousands of Native Americans were residents of such Boarding Schools and members of the class during this period. The class is so numerous that joinder of individual members in this action would be impractical.

34. There are common questions of law and fact involved in this action. Common questions of fact include the direct and indirect conscription of Native American children to the Indian Boarding Schools by the BIA; the knowing creation of an environment conducive to the most extreme forms of child abuse; the BIA's customs and practices fostering child abuse in the Boarding Schools; and the BIA's knowledge and tacit consent of rampant child abuse in the Boarding Schools. Plaintiffs anticipate that the United States will raise defenses that are common to all class members. Additionally, there are common questions of law and fact concerning the rights of class members as members of a Tribe and Band having a Treaty with the United States containing a "Bad Man" clause.

35. The claims of Plaintiffs are typical of the claims of the class, in that the claims of all

Zephier, et al. v. United States of America
Complaint

members of the class, including Plaintiffs, are for child abuse occurring at a young age (6-10), which was an ingrained element of the "education" provided to the Plaintiffs, and for which there are resulting permanent psychological and emotional injuries. Plaintiffs' claims all arose from the same practices and course of conduct. There is no known conflict as between the named Plaintiffs and other members of the class with respect to this action, or with respect to claims for relief set forth in this Complaint.

36. The named Plaintiffs will fairly and adequately protect the interests of the class. All of the Plaintiffs were repeatedly beaten physically during their early years at the Boarding Schools under the control and auspices of the BIA. Each of the named Plaintiffs were, additionally, abused as follows:

  a. Plaintiff, Sherwyn Zephier, attended Boarding School at St. Pauls at Marty, South Dakota, in the Yankton Reservation, where he was beaten and witnessed nuns regularly commit sexual assaults on boys;

  b. Plaintiff, Adele Zephier, attended Boarding School at St. Pauls at Marty where she was sexually abused by a priest, who would put his hands under her dress and fondle and penetrate her. She was also physically abused by the nuns, one of whom would pick her up by her hair, shake her, and lock her in a closet for hours.

  c. Plaintiff, Roderica Rouse, also attended St. Pauls at Marty Boarding School, and was physically beaten and sexually abused by a priest in the same manner as Adele Zephier.

Zephier, et al. v. United States of America
Complaint

    d.    Plaintiff, Lloyd B. One Star, attended the St. Francis Board School in South Dakota, on the Rosebud reservation. He was physically beaten and sexually abused from the age of 6 to age 10 by multiple priests and nuns, which included oral sex and sodomy. He was threatened physically by the priests if he told about the abuse. He was beaten and tortured continuously for a week, including head slappings and paddlings, for telling his father about the abuse.

    e.    Plaintiff, Edna Little Elk, attended the St. Francis Boarding School on the Rosebud reservation in the period 1921-24. She was locked in an attic for days because she did not speak English. She was beaten and stripped by both nuns and priests. She witnessed her cousin, Zona Iron Shell, beaten to death in front of her. She also witnessed other girls being sexually fondled by priests.

    f.    Plaintiff, Christine Medicine Horn, attended the St. Pauls Boarding School at Marty. Because she did not speak English, she was thrown down a three-story laundry chute. She was also stuffed in a trash can and locked in an incinerator for not speaking English. She was forced to strip to her underwear, when she was whipped with a leather strap.

    g.    Plaintiff, Lois L. Long, attended the Holy Rosary Boarding School in the Pine Ridge Reservation. Because she was left-handed, her educator accused her of Satanism and attempted to "cure" her by tying her left hand which caused

permanent physical injuries. She was repeatedly stripped and beaten by nuns. During baths, the nuns would fondle her and attempt to "wash the devil out" of her.

37. This action is properly maintained as a class action in that the prosecution of separate actions by individual members of the class would create a risk of adjudications with respect to the individual members which would as a practical matter be dispositive of the interest of the other members not parties to the adjudications or would substantially impair or impede their ability to protect their interests.

38. This action is properly maintained as a class action inasmuch as there are questions of law and fact common to the members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. In this regard, Plaintiffs are unaware of any litigation that has already been commenced regarding abuse at Indian Boarding Schools.

39. The United States, through the Bureau of Indian Affairs, has acted or refused to act on grounds generally applicable to the class.

40. The trauma of the abuse caused some members of the class to subconsciously suppress or lose their memory of the abuse.

41. The United States fraudulently concealed its complicity in the abuse and its acts and ommisions relating to the abuse at the Indian Boarding Schools. As a fiduciary, the United States had a duty to disclose its knowledge of the abuse and otherwise warn and protect the Native American children.

Zephier, et al. v. United States of America
Complaint

## COUNT I
### TREATY CLAIM TO DAMAGES

42. Plaintiffs repeat and reallage paragraphs 1 through 41 above

43. Under the "Bad Man" clauses of the Treaties described above, the United States is strictly liable for abuses caused by non-Native Americans to members of the class.

44. The teachers, priests, nuns and other officials and administrators of the Indian Board Schools were non-Native Americans who committed acts of abuse upon Indian children within the scope of the "Bad Man" clauses of the Treaties.

45. Plaintiffs have suffered psychological, emotional and physical damages as a direct and proximate result of these acts. including without limitation, inability to cope with everyday life, fear, anger, aggressive behavior, and inability to sustain normal social and family relationships.

WHEREFORE, Plaintiffs demand judgment for compensatory damages, costs and such other and further relief as the Court deems just and proper.

## COUNT II
### BREACH OF TRUST

46. Plaintiffs repeat and reallege paragraphs 1-41 above.

47. The United States had a special relationship with the Plaintiffs as Native Americans. They were historically treated as wards of the United States government and the United States assumed full authority and control over their education. As children who were members of a Tribe, they were conscripted by the United States to Indian Board Schools. The United States, through the BIA, exercised complete dominion and control over the Indian children.

Zephier, et al. v. United States of America
Complaint

48. By virtue of this special relationship, the United States owed Plaintiffs a fiduciary duty of trust and care to protect their safety and well being.

49. The BIA breached this fiduciary duty by their acts and omissions enabling and facilitating rampant physical, sexual and psychological abuse in the Indian Boarding Schools.

50. As a result of this breach of duty, the Plaintiff class has directly and proximately suffered psychological, emotional and physical damages.

WHEREFORE, Plaintiffs demand compensatory damages, costs and such other and further relief as this Court deems just and proper.

DATED this 9th day of April, 2003.

Respectfully submitted,

HERMAN & MERMELSTEIN, P.A.
3230 Stirling Road, Suite One
Hollywood, Florida 33021
www.hermanlaw.com
Telephone: 954.962.2200
Facsimile: 954.962.4292

By: _____
Jeffrey M. Herman
Florida Bar No. 521647
Stuart S. Mermelstein
Florida Bar No. 947245

L:\DOCS\Clients\INDIANCLAIMS\Complaint.wpd