ORIGINAL

# UNITED STATES COURT OF FEDERAL CLAIMS

SHERWYN ZEPHIER,
ADELE ZEPHIER, RODERICA
ROUSE, LLOYD B. ONE STAR,
EDNA LITTLE ELK, CHRISTINE
MEDICINE HORN and LOIS L. LONG,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,

      Plaintiffs,

vs.

UNITED STATES OF AMERICA,

      Defendant.

_____/

CASE NO: 03-768 L

Judge Diane Gilbert Sypolt

FILED

NOV - 5 2003

U.S. COURT OF
FEDERAL CLAIMS

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Respectfully submitted,

HERMAN & MERMELSTEIN, P.A.
Attorneys for Plaintiffs
3230 Stirling Road
Suite One
Hollywood, Florida 33021
Telephone 954/962-2200



# TABLE OF CONTENTS

Page

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

C. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.     THE UNITED STATES IS NOT ENTITLED TO DISMISSAL
          UNDER EITHER FED.R.CIV.P. 12(b)(1) or 12(b)(6) . . . . . . . . . . 6

    II.    PLAINTIFFS ARE NOT REQUIRED TO EXHAUST
          ADMINISTRATIVE  REMEDIES BECAUSE THE
          BUREAU OF INDIAN AFFAiRS AND DEPARTMENT
          OF THE INTERIOR DO  NOT HAVE AUTHORITY
          TO AWARD MONEY DAMAGES ON "BAD MEN" CLAIMS . . . 8

    III.   PLAINTIFFS' CLAIM FOR BREACH OF TRUST
          IS COGNIZABLE UNDER THE TUCKER ACT . . . . . . . . . . . . . 16

D. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

Advanced Cardiovascular Systems, Inc. v. Science Life Systems, Inc.,
988 F.2d 1157 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Arnold v. Goetz, 245 F.Supp. 2d 527 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . 7

Barbara v. New York Stock Exchange, Inc., 99 F.3d 49 (2d Cir. 1996) . . . . . . . 11

Begay v. United States, 219 Ct. Cl. 599 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . 12

Begay v. United States, 650 F.2d 288, 224 Ct. Cl. 712 (1980). . . . . . . . . . . . . . .12

Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 308,
91 S.Ct. 1999 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Church of Scientology Int'l v. Eli Lilly & Co., 848 F.Supp. 1018
(D.D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Clinkenbeard v. Central Southeast Oil Corp., 526 F.2d 649,
(5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 101-02 (1957) . . . . . . . . . . . . . . . . 7

Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689 (1973). . . . . . . . . . . . . . . . . . . 9

Hebah v. United States, 428 F.2d 1334, 192 Ct. Cl. 785 (1970) . . . . . . . . . . 12, 13

McCarthy v. Madigan, 503 U.S. 140, 112 S.Ct. 1081 (1992) . . . . . 1, 9-11, 13, 15

Navajo Tribe of Indians v. United States, 624 F.2d 981,
224 Ct. Cl. 171 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Reiter v. Cooper, 507 U.S. 258, 113 S.Ct. 1213 (1993) . . . . . . . . . . . . . . . . . . . 10

Tozzi v. EPA, 148 F.Supp. 2d 35 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 7

Tsosie v. United States, 825 F.2d 393 (Fed.Cir. 1987) . . . . . . . . . . . . . . . . 6, 11-14

Underwood v. Wilson, 151 F.3d 292 (5th Cir. 1998), cert. denied,
526 U.S. 1133, 119 S.Ct. 1809 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Mitchell, 445 U.S. 535, 100 S.Ct. 1349 (1980) . . . . . . . . . . . 2, 18

United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961
(1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 18, 19, 22, 23

United States v. White Mountain Apache Tribe, 537
U.S. 465, 123 S.Ct. 1126 (2003) . . . . . . . . . . . . . . . . . . . . . . . . 1, 16, 18, 19, 22, 24

United States v. Western Pacific R.R. Co., 352 U.S. 59, 77 S.Ct. 161 (1956) . . . 10

United Tribe of Shaunee Indians v. United States, 253 F.3d 543,
551 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## STATE CASES

Doe v. Evans, 814 So.2d 370 (Fla. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## FEDERAL STATUTES AND RULES

25 U.S.C. §§271, 272, 272a, 282 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 21

Act of March 2, 1889, Ch. 412, §10, 25 Stat. 1003 . . . . . . . . . . . . . . . . . . . . . . . 3

Fed.R.Civ.P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 24

Fed.R.Civ.P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Tucker Act, 28 U.S.C. §1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 12, 16, 19

Treaty With the Yankton Sioux of 1858, 11 Stat. 743 . . . . . . . . . . . . . . . . . . . 3, 20

## **FEDERAL REGULATIONS**

25 C.F.R. §§1.2, 2.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

43 C.F.R. §§ 4.5, 4.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## **OTHER AUTHORITIES**

Washburn, v. 1 *The American Indian and the United States - A Documentary History* (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 21, 22

37 **Am. Jur. 2d**, *Fraud and Deceit* §32 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . .22

## A. **Introduction**

Defendant moves to dismiss both Counts of Plaintiffs' two-Count Complaint. Under Count I of the Complaint, Plaintiffs assert a right to damages pursuant to "bad men" clauses in various Treaties for physical, sexual and psychological abuse suffered at Indian boarding schools. Defendant contends that Plaintiffs have failed to exhaust their administrative remedies for relief under Count I. Plaintiffs, however, are not required here to exhaust administrative remedies because there is no administrative agency with authority to resolve their claims for money damages. In particular, the Bureau of Indian Affairs ("BIA") and the Department of the Interior appear to have no authority to grant monetary relief for a "bad men" claim. Under the authority of McCarthy v. Madigan, 503 U.S. 140, 112 S.Ct. 1081 (1992), administrative exhaustion is therefore unnecessary.

Under Count II of the Complaint, Plaintiffs allege a breach of trust by the Government in their supervision and control of the Indian boarding schools. Defendant contends that there is no statute or regulation which affords Plaintiffs a right to monetary damages for their claims in this Count and, hence, there is no right to relief under the Tucker Act. To the contrary, Plaintiffs have a right to monetary damages for breach of trust under the authority of United States v. White Mountain

1

Apache Tribe, 537 U.S. 465, 123 S.Ct. 1126 (2003), and United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961 (1983), because the Government exercised complete and pervasive dominion and control over Indian boarding schools pursuant to statutes and regulations. Plaintiffs accordingly request that Defendant's Motion to Dismiss be denied in its entirety.

## B. Background

Plaintiffs bring this class action for money damages under the Tucker Act, 28 U.S.C. §1491, based upon the severe physical, sexual and psychological abuse suffered by Plaintiffs and the Plaintiff class in Indian boarding schools operated under the control of the United States Government. As set forth in the Complaint, in the late 19th Century, the Government engaged in a concerted effort to place Indian children in boarding schools. This was initially accomplished in many instances by force or coercion. (Complaint ¶ 18 & 19). The purpose of the boarding schools was to assimilate the children and obliterate their native cultures. (Id. ¶17). The children were punished by inhuman methods if they spoke their tribal languages or practiced any element of their native cultures. (Id. ¶¶23, 24, 27). While the abuse was suffered by children of all ages, it was most intense for the youngest children, ages 6-10. (Id., ¶26).

2

The Bureau of Indian Affairs ("BIA") had complete dominion and control over the placement of children, and the policies, practices and conditions at the Indian boarding schools, including those operated by churches and missions. (Complaint ¶28). By statute, the Government established the framework for the Indian boarding school system in the late 19th century. 25 U.S.C. §271 et seq. This was done in furtherance of various Treaty stipulations in which the Government assumed control of the Indian peoples' education for purposes of their "civilization." (See, e.g., Treaty with the Yankton Sioux of 1858, 11 Stat. 743, Appendix "A" hereto). By Act of March 2, 1889, Ch. 412, §10, 25 Stat. 1003, the position of Superintendent of Indian Schools was created and the Secretary of Interior granted broad discretionary authority to assign the Superintendent duties over Indian schools, which was likewise for purposes of the "advancement of the pupils therein toward civilization":

> There shall be appointed by the President, by and with the advise and consent of the Senate, a person of knowledge and experience in the management, training and practical education of children, to be Superintendent of Indian Schools, whose duty it shall be to visit and inspect the schools in which Indians are taught in whole or in part from appropriations from the United States Treasury, and report to the Commissioner of Indian Affairs what, in his judgment, are the defects, if any, in any of them, in system, in administration, or in means for the most effective advancement of the pupils therein toward civilization and self-support, and what changes are needed to remedy such

3

> defects as may exist, and to perform such other duties in
> connection with Indian schools as may be prescribed by the
> Secretary of the Interior.

25 U.S.C. §272 (1908).

The Report of Commissioner of Indian Affairs T.J. Morgan dated September 5, 1890, included a letter entitled "Rules for Indian Schools" sent by the Secretary of the Interior to each newly appointment reservation Agent. (Report reprinted in Washburn, v. 1 *The American Indian and the United States - A Documentary History,* 435, 486-500 (1973)) (hereafter referred to as the "Morgan Report") (relevant portions of the Morgan Report concerning Indian education are set forth in Appendix "B" hereto). This letter sets forth the organizational hierarchy for managerial control of the Indian boarding school system - Superintendent, Supervisors of Education, Agents and School Superintendents - under which extensive and pervasive control of the Indian Boarding Schools was exercised by the United States Government.[1]

Under these regulations, the United States asserted control over, among other things:

- enrollment at the schools

---

[1] Specific provisions of these Rules, particularly those relating to the policies described in the Complaint, are set forth in Argument §III infra.

- conditions of the schools

- physical welfare of the children

- discipline and punishment at the schools

- personal appearance and clothing of the children

- curfew, access and security at the schools

- curriculum, instruction, schedule and recreation

(Morgan Report at 488-495, Appendix "B" at 27-34).

The Complaint in this action sets forth two Counts. Count I is for damages under various Treaties entered into by the United States and ratified by Congress, which each contain a "bad men" clause. This clause typically states as follows:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agency and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also to ***reimburse the injured persons for the loss sustained***. (Emphasis added)

The allegations in the Complaint set forth acts of abuse committed upon Plaintiffs and the Plaintiff class which are compensable within the terms of these "bad men" clauses. (Complaint ¶¶ 43-45). Count II of the Complaint seeks money damages for the Defendant's breach of trust in enabling and facilitating physical, sexual and

5

psychological abuse at the Indian boarding schools, which were operated within the

Government's complete dominion and control. (Complaint ¶¶ 47-50).

## C. Argument

### I. THE UNITED STATES IS NOT ENTITLED TO DISMISSAL UNDER EITHER FED.R.CIV.P. 12(b)(1) or 12(b)(6)

The United States moves to dismiss pursuant to Rules 12(b)(1) and 12(b)(6)

of the Federal Rules of Civil Procedure. The motion under Rule 12(b)(1) asserts that

this Court lacks subject matter jurisdiction on the grounds that (i) Plaintiffs failed to

exhaust their administrative remedies prior to filing suit on their Count I claims under

Treaty "bad men" clauses; and (ii) this Court does not have jurisdiction of Plaintiffs'

Count II Breach of Trust claims under the Tucker Act, 28 U.S.C. §1491(a).[2]  As a

preliminary matter, the Government assumes without discussion that the issue of

administrative exhaustion is jurisdictional and thus subject to Rule 12(b)(1). This

assumption with respect to claims under the Treaty "bad men" clauses is incorrect.

"A statute requiring exhaustion of administrative remedies may be jurisdictional if

it is 'more than a codified requirement of administrative exhaustion' and contains

---

[2]It is unclear whether Defendant is raising jurisdiction under the Tucker Act as a Rule 12(b)(1) issue with respect to both Counts I and II of the Complaint, or just Count II. There should be no question that Tucker Act jurisdiction lies under Plaintiffs' Count I claims for Treaty damages pursuant to Treaty "bad men" clauses. Tsosie v. United States, 825 F.2d 393, 401 (Fed.Cir. 1987).

'sweeping and direct' statutory language that goes beyond a requirement that only exhausted actions be brought." Underwood v. Wilson, 151 F.3d 292, 294 (5th Cir. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809 (1999) (quoting Weinberger v. Salfi, 422 U.S. 749, 757, 95 S.Ct. 2457, 2463 (1975)). The Government relies on Treaty language for its administrative exhaustion argument that does not come close to such a "sweeping and direct" pronouncement. Indeed, this language is ambiguous and confusing in application. (See §II infra). Accordingly, administrative exhaustion would be an affirmative defense, not a jurisdictional prerequisite subject to a Rule 12(b)(1) dismissal. See Arnold v. Goetz, 245 F.Supp. 2d 527, 533-34 (S.D.N.Y. 2003) (reviewing case law on issue of administrative exhaustion as jurisdictional in case of claim by federal prisoner).[3]

Defendant also seeks a dismissal of Plaintiffs' Count II Breach of Trust claims pursuant to Fed.R.Civ.P. 12(b)(6). Under Rule 12(b)(6) dismissal is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78

---

[3]Defendant's contention that this Court lacks Tucker Act jurisdiction over Plaintiffs' Count II Breach of Trust claims is incorrect for the reasons set forth in Section III, infra. There and in Appendix "A" hereto, Plaintiffs set forth the record required under Rule 12(b)(1) demonstrating Tucker Act subject matter jurisdiction. See Tozzi v. EPA, 148 F.Supp. 2d 35, 41 (D.D.C. 2001) (noting that court may consider materials outside the pleading in deciding a Rule 12(b)(1) motion). This record consists of statutes and regulations under which the Government exercised complete dominion and control over Indian boarding schools and their students.

S.Ct. 99, 101-02 (1957). The allegations of the Complaint are taken as true and "all reasonable inferences are drawn in favor of the complainant." Advanced Cardiovascular Systems, Inc. v. Science Life Systems, Inc., 988 F.2d 1157 (Fed. Cir. 1993). "Dismissal is improper unless there is no reasonable view of the facts which could support the claim." Id. As set forth below, this high standard is not satisfied here.

## II. PLAINTIFFS ARE NOT REQUIRED TO EXHAUST ADMINISTRATIVE REMEDIES BECAUSE THE BIA AND DEPARTMENT OF THE INTERIOR DO NOT HAVE AUTHORITY TO AWARD MONEY DAMAGES ON "BAD MEN" CLAIMS

The United States has moved to dismiss on the grounds that Plaintiffs failed to exhaust their administrative remedies. Plaintiffs need not resort to administrative remedies, however, because the administrative agency in question lacks the authority to grant the requested relief, in this instance money damages.

Defendant relies upon the language of the "bad men" clauses in the Treaties referenced in paragraph 13 of the Complaint, which provide that "the United States will, upon proof made to the agency and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once ... to reimburse the injured persons for the loss sustained." Defendant does not, however, make reference to any Congressional legislation or regulations of the Bureau of Indian Affairs or the

8

Department of the Interior which implement the "bad men" clauses. In particular, there is nothing in Defendant's Motion to indicate that any Government agency or department has the authority to award money damages for a claim under a "bad men" clause.

The Supreme Court discussed exceptions to the administrative exhaustion requirement in <u>McCarthy v. Madigan</u>, 503 U.S. 140, 112 S.Ct. 1081 (1992). The Court noted that "[t]his Court's precedents have recognized at least three broad sets of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion." 503 U.S. at 146, 112 S.Ct. at 1087. These circumstances include (i) "requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action"; (ii) "an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief' "; and (iii) "an administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it." <u>Id.</u>, 503 U.S. at 146-148, 112 S.Ct. at 1087-1088 (quoting <u>Gibson v. Berryhill</u>, 411 U.S. 564, 575 n.14, 93 S.Ct. 1689, 1696 n.14 (1973)).

In this case, the administrative agency is not empowered to grant effective

9

relief, and thus the second exception is applicable to preclude a dismissal for failure

to exhaust administrative remedies. In McCarthy, the issue was "whether a federal

prisoner must resort to the internal grievance procedure promulgated by the Federal

Bureau of Prisons, pursuant to the authority of Bivens v. Six Unknown Fed. Narcotics

Agents, 403 U.S. 308, 91 S.Ct. 1999 (1971), solely for money damages." 503 U.S.

at 141, 112 S.Ct. at 1084. The Court held that the petitioner was not required to

exhaust administrative remedies, in large part because "[w]e conclude that the

absence of any monetary remedy in the grievance procedure also weighs heavily

against imposing an exhaustion requirement." Id. 503 U.S. at 154, 112 S.Ct. at 1091.

See also Reiter v. Cooper, 507 U.S. 258, 113 S.Ct. 1213 (1993) (exhaustion of

administrative remedies not applicable to the petitioner's claim for reparations under

the Interstate Commerce Act because the Interstate Commerce Commission did not

have statutory authority to grant such monetary relief); United States v. Western

Pacific R.R. Co., 352 U.S. 59, 77 S.Ct. 161 (1956) (" 'exhaustion' applies where a

claim is cognizable in the first instance *by an administrative agency alone*")

(emphasis supplied). In a concurrence, Justice Rehnquist made it clear that

exhaustion of administrative remedies should not be required in a claim for monetary

relief where the agency is not empowered to grant that relief:

10

> I agree with the Court's holding that a federal prisoner
> need not exhaust the procedures promulgated by the
> Federal Bureau of Prisons. My view, however, is based
> entirely on the fact that the grievance procedure at issue
> does not provide for any award of monetary damages. As
> a result, in cases such as this one where prisoners seek
> monetary relief, the Bureau's administrative remedy
> furnishes no effective remedy at all, and it is therefore
> improper to impose an exhaustion requirement.

McCarthy, 503 U.S. at 156, 112 S.Ct. at 1092. See also Barbara v. New York Stock Exchange, Inc., 99 F.3d 49, 56-57 (2d Cir. 1996) (in claim for misconduct in disciplinary proceedings conducted by the New York Stock Exchange, the Court affirmed dismissal of claims for declaratory/injunctive relief, which were within the province of the Securities and Exchange Commission, on grounds of failure to exhaust administrative remedies, but reversed the district court's dismissal of the plaintiff's claim for monetary relief because "the administrative review provisions of the [Securities] Act do not provide for money damages").

The Government relies upon Tsosie v. United States, 825 F.2d 393 (Fed.Cir. 1987), in support of an exhaustion requirement under a "bad men" clause. Tsosie, however, supports jurisdiction in this Court under the Tucker Act and does not otherwise compel exhaustion of administrative remedies. There, the Federal Circuit considered on interlocutory appeal the certified question of whether the Treaty "bad

11

men" clauses had become obsolete and abandoned, and were thus unenforceable. Id.

at 394-95. The Court held that such a determination was outside the scope of the

judiciary; the real issue was whether the "bad men" clauses had been preempted by

congressional act, or had otherwise expired by their own terms or by consent, which

they had not. Id. at 401, 403. The Court also rejected the Government's argument

that the claim was outside the scope of the Tucker Act, 28 U.S.C. §1491, and

therefore nonjusticiable, because the Treaty stated that the decision of the

Commission of Indian Affairs would be binding on the parties. The Court noted that

"the Tucker Act itself, as amended in 1949, preempts a treaty restriction making

claims nonjusticiable. As the 1949 acts were in relief of Indians, and removed their

disabilities, the judicial reluctance to find preemption of treaty rights would not

obtain." Id. at 407. Accordingly, Tsosie stands for the propositions that the Treaty

"bad men" clauses are enforceable and that claims thereunder are justiciable under

the Tucker Act.

The Government also relies upon Hebah v. United States, 428 F.2d 1334, 192

Ct. Cl. 785 (1970), Begay v. United States, 219 Ct. Cl. 599 (1979) ("Begay I"), and

Begay v. United States, 650 F.2d 288, 224 Ct. Cl. 712 (1980) ("Begay II"), in support

of an administrative exhaustion requirement for enforcement of a "bad men" clause.

All of these cases were decided before McCarthy, and none of them considered the issue of whether the BIA or the Department of the Interior had the authority to grant effective relief in the form of money damages. In Hebah, the Court noted that the petitioner "alleges that claim was made upon the Superintendent of the Wind River Indian Agency and a copy sent to the Commissioner of Indian Affairs in Washington." 428 F.2d at 1340. As a result, the administrative exhaustion issue was not before the Court and there was no need to address it. In Begay I, the issue was whether the plaintiff had given the administrative agency sufficient opportunity to decide the claim before filing suit. In Begay II, the Court dismissed the claim after the plaintiff's "multiple derilictions" in an administrative proceeding before the Department of the Interior. The dismissal was based upon a failure to exhaust administrative remedies premised upon a "virtual failure to prosecute."[4] Tsosie, 825 F.2d at 402. Accordingly, the Courts in Begay I and Begay II, like Hebah, all had before them "bad men" claims which had been presented in some manner to the BIA or Department of Interior, and therefore these Courts did not address or decide the issue raised here, *to wit*, whether administrative exhaustion is necessary when the

---

[4]Begay II is an unpublished disposition and thus has no precedential value. Tsosie, 825 F.2d at 397-98. In any event, the issue raised herein is "matter unstated and undiscussed" in Begay II, and thus it would not be precedential. Id.

agency does not have the authority to grant the relief sought.

The Court in Tsosie noted certain incongruities in applying the Treaty language against "a 'bad man' of the white side." 825 F.2d at 402. Any such incongruities which were susceptible to an interpretation denying justiciability were rejected as preempted by the Tucker Act. Id. The Court also discussed the lack of any authority regarding the standard of review for an administrative determination of a "bad men" claim, stating that the lower court "purports to discover a 'substantial evidence' standard [in Begay I], but we are unable to do so." 825 F.2d at 402. While noting these problems of the Treaty language in practice, the Tsosie Court expressly declined to address issues regarding the administrative review process of Treaty "bad men" claims.[5] In particular, the Court left open the question of how the BIA or Department of Interior could "reimburse the injured persons for the loss sustained", as set forth in the Treaty language, absent the authority to do so.[6]

---

[5]The lower court in Tsosie had remanded for an administrative determination by the Assistant Secretary of the Interior. Because the Tsosie Court had before it a certified question in an interlocutory appeal, it chose to limit its review and not disturb the lower court's remand order or otherwise address the standard of review issue. Id. at 402. The court did not have before it and did not address the question of whether administrative exhaustion was necessary in the first instance.

[6]There does not appear to be any implementing legislation for "bad men" claims. The Bureau of Indian Affairs and Department of Interior have procedural rules for hearings and appeals generally. See 25 C.F.R. §§1.2, 2.1, et seq.; 43 C.F.R. §§ 4.5, 4.20 et seq. However, it does not appear from the applicable statutes and regulations that they would have the authority to grant monetary relief, particularly for the substantial damages claimed by Plaintiffs and the

14

The authority to grant monetary relief for Treaty damages was vested in this Court under the Tucker Act. Accordingly, the only common sense reading of the Treaties is to find that this Court may adjudicate "bad men" claims in the first instance.[7] Proceeding before the administrative agency would be an empty, meaningless exercise, serving only to cause delay and confusion.[8] There is no purpose or policy for the requirement of administrative exhaustion in the adjudication of a "bad men" claim, particularly in this case. The BIA has no particular expertise or qualification to determine claims to monetary damages arising from child abuse. McCarthy, 503 U.S. at 145, 112 S.Ct. at 1086 (noting that policy behind exhaustion requirement takes on "particular force" when the agency is asked to "apply its special expertise"); see also United Tribe of Shaunee Indians v. United States, 253 F.3d 543, 551 (10th Cir. 2001) (finding that the determination of whether a particular group of

---

Plaintiff class, nor has the Government asserted any such authority here. Accordingly, the instant regulatory scheme is analogous to that for the federal prison system before the Court in McCarthy. In McCarthy, the Government asserted a "conversion" argument, contending that a money damages claim could be "converted" by the agency to a claim under the Federal Tort Claims Act, for which the agency was authorized to award money damages. The Court rejected this argument, holding that there was no evidence of such a "conversion" practice, and thus a money damages remedy was at best "uncertain". 503 U.S. at 140, 112 S.Ct. at 1091-92.

[7]In McCarthy, the Court notes that the issue of exhaustion is within "sound judicial discretion" unless Congress has "clearly required" exhaustion. 503 U.S. at 144, 112 S.Ct. at 1086. As discussed above, the language at issue in the Treaty "bad men" clauses is laden with ambiguity and confusion in application, and, to say the least, does not clearly require exhaustion.

[8]See, e.g., discussion supra regarding standard of review.

15

Indians exists as a tribe requires "special agency expertise"). Indeed, such issues are traditionally resolved in the Courts.

For the foregoing reasons, the exhaustion of administrative remedies should not be required for Plaintiffs' "bad men" claims.

### III. PLAINTIFFS' CLAIM FOR BREACH OF TRUST IS COGNIZABLE UNDER THE TUCKER ACT

Defendant seeks dismissal of Count II of Plaintiffs' Complaint for Breach of Trust on the grounds that there is no basis for jurisdiction under the Tucker Act, 28 U.S.C. §1491(a), because the Plaintiffs do not set forth a substantive right enforceable against the United States by a claim for money damages. Plaintiffs, to the contrary, believe that they have set forth in their Complaint a substantive right to damages for breach of a fiduciary relationship consistent with the Supreme Court's opinions in United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961 (1983) ("Mitchell II") and United States v. White Mountain Apache Tribe, 537 U.S. 465, 123 S.Ct. 1126 (2003). Specifically, as alleged in the Complaint, the BIA exercised a level of dominion and control over Indian children placed in the Indian Boarding School System sufficient to establish a fiduciary relationship, the breach of which under fiduciary principles establishes a claim for money damages. (Complaint ¶¶ 47-50).

In Mitchell II, the Court found a substantive right against the Government for

16

money damages for breach of a fiduciary relationship based upon certain statutes and

regulations, which "clearly give the Federal Government *full responsibility* to manage

Indian resources and land for the benefit of the Indians." Id., 463 U.S. at 224, 103

S.Ct. at 2971-72 (emphasis supplied). The Court noted that a "fiduciary relationship

necessarily arises when the Government assumes such *elaborate control* over forests

and property belonging to Indians." Id., 463 U.S. at 224, 103 S.Ct at 2972 (emphasis

supplied). The Court further quoted with approval Navajo Tribe of Indians v. United

States, 624 F.2d 981, 987, 224 Ct. Cl. 171, 183 (1980), which found a fiduciary

relationship "where the Federal Government takes on or has *control or supervision*

over tribal monies or properties ..." Id. (emphasis supplied). Based on these "clearly

establish[ed]" fiduciary obligations, the Court held that the relevant statutes and

regulations "can fairly be interpreted as mandating compensation by the Federal

Government for damages sustained." Id., 463 U.S. at 226, 103 S.Ct. at 2973. In

making this holding, the Court specifically referenced the Government's special

duties owed to the Indian People:

> Our construction of these statutes and regulations is
> reinforced by the undisputed existence of a general trust
> relationship between the United States and the Indian
> people. This Court has previously emphasized "the
> distinctive obligation of trust incumbent upon the
> Government in its dealings with these dependent and

17

sometimes exploited people."

Id., 463 U.S. at 225, 103 S.Ct. at 2972 (quoting Seminole Nation v. United States, 316 U.S. 286, 296, 62 S.Ct. 1049, 1054 (1942)).[9] This trust relationship extends to the Indian peoples' liberty interests (*i.e.*, their person as opposed to their property), as reflected in the Northwest Ordinance of 1787, which provides that "[t]he utmost good faith shall always be observed towards the Indians, their lands and property shall never be taken from them without their consent; and in their property, *rights and liberty*, they never shall be invaded or disturbed, unless in just and lawful wars authori[z]ed by Congress." (Emphasis supplied) (Complaint ¶12).

In White Mountain Apache, the Court reiterated the "fair inference" standard in ruling upon the right to recover money damages in a Tucker Act claim:

> It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be "lightly inferred," 463 U.S., at 218, 103 S.Ct. 2961, a fair inference will do.

123 U.S. at 1132. The Court rejected the Government's argument that there had to

---

[9] Mitchell II is distinguishable from U.S. v. Mitchell, 445 U.S. 535, 100 S.Ct. 1349 (1980) (Mitchell I"), where the Court held that a "bare trust" would not support the inference of a money damages remedy under the Tucker Act. In Mitchell I, in contrast to Mitchell II, there was "no mandate that the United States manage the site on behalf of the Tribe and thus no predicate in the statutes and regulations identified by the Tribe for finding a fiduciary obligation enforceable by monetary relief." White Mountain Apache, 123 S.Ct. at 1131.

be an express statutory provision for recovery of money damages to support a claim

under the Tucker Act:

> To the extent that the Government would demand an explicit provision for money damages to support every claim that might be brought under the Tucker Act, it would substitute a plain and explicit statement standard for the less demanding requirement of fair inference that the law was meant to provide a damages remedy for breach of a duty. To begin with, this would leave *Mitchell II* a wrongly decided case, for one would look in vain for a statute explicitly providing that inadequate timber management would be compensated through a suit for damages. But the more fundamental objection to the Government's position is that, if carried to its conclusion, it would read the trust relation out of Indian Tucker Act analysis; if a specific provision for damages is needed, a trust obligation and trust law are not.

123 S.Ct. at 1134.[10] The Court discussed the holding in <u>Mitchell II</u>, noting that it

turned on the level of dominion and control exercised by the Government pursuant

to statutes and regulations:

> [W]e found that statutes and regulations specifically addressing the management of timber on allotted lands raised the fair implication that the substantive obligations imposed on the United States by those statutes and regulations were enforceable by damages. The Department

---

[10] The Government in its Memorandum supporting its Motion to Dismiss argues that this Court should not recognize a damages remedy absent a statute which "clearly sanctions one." (Defendant's Memorandum p. 11). This reflects the incorrect standard for determining the right to bring a Tucker Act claim which was rejected in <u>White Mountain Apache</u>.

19

> of the Interior possessed "comprehensive control over the harvesting of Indian timber" and "exercise[d] literally daily supervision over [its] harvesting and management," giving it a "pervasive" role in the sale of timber from Indian lands under regulations addressing "virtually every aspect of forest management," ... .

Id. at 1133 (citations omitted).

As set forth in the Complaint and the Appendix hereto, the United States by statutes and BIA regulations established full dominion and control over Indian children through the Indian boarding school system. For example, in the Treaty with the Yankton Sioux of 1858, 11 Stat. 743, there is authorized a capital expenditure for school houses,

> which school or schools shall be conducted in such manner as the Secretary of the Interior shall direct. The said Indians hereby stipulating to keep constantly thereat, during at least nine months in the year, all their children between the ages of seven and eighteen years; and if any of the parents, or other having the care of children, shall refuse or neglect to send them to school, such parts of their annuities as the Secretary of the Interior may direct, shall be withheld from them and applied as he may deem just and proper.

(Appendix "A" at 3-4).

Federal statutes provided the Secretary of the Interior, Commission of Indian Affairs and the Superintendent of Indian Schools broad authority and discretion over the

education of Indian children. <u>See</u>, <u>e.g.</u>, 25 U.S.C. §§271, 272, 272a and 282. Within this discretion and authority, the Commissioner of Indian Affairs adopted detailed regulations covering every aspect of life for the Indian children in the boarding school system. (Morgan Report , Appendix "B", at 25-39).

Under these regulations, the Government's Agent was responsible for supervision of the schools. The Agent was required to periodically visit all schools on the reservation, "whether Government, contract, or mission." (<u>Id.</u>, Morgan Report at 488, Appendix "B" at 27, ¶2). The Agent was, among other things, "expected to see that the pupils have proper moral, mental, and industrial training; that their physical welfare is properly cared for ... ." (<u>Id.</u>, Morgan Report at 488, Appendix "B" at 27, ¶5). Directly beneath the Agent in the supervisory hierarchy under these regulations was the school Superintendent, who was given "immediate general control of the school." (<u>Id.</u>, Morgan Report at 489, Appendix "B" at 28, ¶7). He was required to "give close personal attention to every department at the school." (<u>Id.</u>, ¶12). The regulations provided that "all serious questions of discipline must be referred to the Superintendent." (<u>Id.</u>, Morgan Report at 495, Appendix "B" at 34, ¶53). Further, speaking tribal languages was a recognized basis for punishment:[11]

---

[11]The proscription of speaking tribal languages was the basis for severe physical and psychological abuse at the boarding schools, as set forth in the Complaint. (See Complaint ¶¶21-

> All instruction must be in the English language. Pupils must be compelled to converse with each other in English, and should be properly rebuked or punished for persistent violation of this rule. Every effort should be made to encourage them to abandon their tribal language.

(Id., Morgan Report at 493, Appendix "B" at 32, ¶41).

The Government's control over life at the boarding schools, in accordance with the foregoing regulations, was comprehensive and pervasive, similar to that under the statutes and regulations at issue in Mitchell II and White Mountain Apache. Also as in Mitchell II and White Mountain Apache, there is present here a fiduciary relationship between the children at the Indian boarding schools and the Government. It is well established in the common law that a fiduciary relationship is not limited to commercial dealings, "but extends to all relations in which confidence is reposed, and in which dominion and influence resulting from such confidence may be exercised by one person over another." 37 **Am. Jur. 2d**, *Fraud and Deceit* §32 (2003). The relation and duties in a fiduciary relationship "may be moral, social, domestic or personal." Id.; Clinkenbeard v. Central Southeast Oil Corp., 526 F.2d 649, 653 (5th Cir. 1976); See also Doe v. Evans, 814 So.2d 370 (Fla. 2002) (finding fiduciary duty in a counseling relationship); see also Church of Scientology Int'l v.

---

23, 36 (e) and (f)).

Eli Lilly & Co., 848 F.Supp. 1018, 1028 (D.D.C. 1994); (noting that existence of fiduciary relationship is a "fact-intensive question").

The United States has previously admitted that it acted as trustee in regards to children at the Indian Boarding Schools. The trust relationship between the children at the Indian boarding schools and the United States was discussed by Kevin Gover, Assistant Secretary - Indian Affairs, Department of the Interior, in an address of September 8, 2000:

> This agency forbade the speaking of Indian languages, prohibited the conduct of traditional religious activities, outlawed traditional government, and made Indian people ashamed of who they were. Worst of all, *the Bureau of Indian Affairs committed these acts against the children entrusted to its boarding schools*, brutalizing them emotionally, psychologically, physically, and spiritually. (Emphasis supplied).

There is no conceivable basis to limit fiduciary or trust duties in the Tucker Act context to money, tangible property or commercial relations. Indeed, it would seem that the breach of a personal fiduciary relationship between the Government and children, resulting in physical and sexual abuse and consequent psychological and emotional damages, would call for a greater level of protection and a more compelling reason to find a waiver of sovereign immunity under the Tucker Act than in commercial fiduciary relations. Accordingly, under Mitchell II and White

23

Mountain Apache there is a "fair inference" of a right to money damages against the

United States for breach of trust based upon the pervasive control of Indian boarding

schools assumed by the Government under statutes and regulations.

## D. **Conclusion**

Based on the foregoing, the Complaint is not subject to dismissal under either

Fed.R.Civ.P. 12(b)(1) or 12 (b)(6). First, it was unnecessary for Plaintiffs to exhaust

administrative remedies because the BIA and the Department of the Interior are not

empowered to grant Plaintiffs monetary relief for their Count I "bad men" claims.

Second, this Court has subject matter jurisdiction of Plaintiffs' Count II claims for

Breach of Trust under 28 U.S.C. §1491 because the Plaintiffs' right to monetary relief

is fairly inferred from the fiduciary duty owed by the Government to the Indian

children given the Government's complete and pervasive dominion and control by

24

statutes and regulations over the Indian boarding schools. Plaintiffs therefore request

that Defendant's Motion be denied in its entirety.

Respectfully submitted,

HERMAN & MERMELSTEIN, P.A.
3230 Stirling Road, Suite One
Hollywood, Florida 33021
www.hermanlaw.com
Telephone: 954.962.2200
Facsimile: 954.962.4292

By: _____

Jeffrey M. Herman
Florida Bar No. 521647
Stuart S. Mermelstein
Florida Bar No. 947245

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via **Federal Express** on **October 20, 2003**, to: Caroline M. Blanco, Esquire, Department of Justice, Environmental and Natural Resources Division, General Litigation Section, Post Office Box 663, Washington, D.C. 20044-0663.

L:\DOCS\Clients\INDIANCLAIMS\plea\brief.wpd

## UNITED STATES COURT OF FEDERAL CLAIMS

SHERWYN ZEPHIER,
ADELE ZEPHIER, RODERICA
ROUSE, LLOYD B. ONE STAR,
EDNA LITTLE ELK, CHRISTINE
MEDICINE HORN and LOIS L. LONG,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,

        Plaintiffs,

vs.

UNITED STATES OF AMERICA,

        Defendant.

_____/

CASE NO: 03-768 L

Judge Diane Gilbert Sypolt


## APPENDIX TO
## PLAINTIFFS' MEMORANDUM OF POINTS
## AND AUTHORITIES IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

# INDEX TO APPENDIX

Page

### APPENDIX A

Treaty with the Yankton Sioux, 1858. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

### APPENDIX B

Report of Commissioner of Indian Affairs T.J. Morgan, September 5, 1890. . . . . 9

# APPENDIX A

## TREATY WITH THE YANKTON SIOUX, 1858.

### Apr. 19, 1858. | 11 Stat., 743. | Ratified Feb. 16, 1859. | Proclaimed Feb. 26, 1859.

*Indian Affairs: Laws and Treaties.* Vol. II (Treaties). Compiled and edited by Charles J. Kappler. Washington: Government Printing Office, 1904.
Home | Disclaimer & Usage | Table of Contents | Index

Vol. II, Pages 776-781 | Page 777 | Page 778 | Page 779 | Page 780 | Page 781

Vol. II, Page Images | Page 776 | Page 777 | Page 778 | Page 779 | Page 780 | Page 781

**Margin Notes:**

Lands relinquished to the United States, except, etc.
Boundaries of land ceded.
Islands in the Missouri River.
Title.
Necessary roads may be built across the lands reserved, paying damages therefor.
Indians to settle etc., on reservation within a year.
Agreements on part of the United States.
Protection on the reserved lands.
Payment of annuities.
Subsistence.
Purchase of stock. etc.
Schools and school-houses.
Indians to furnish apprentices for mills, etc.
President may discontinue allowance for shcool.
United States to furnish mills, mechanic shops, etc.
Mills, etc., not to be injured.
If injured value to be deducted from annuity.
Houses, etc., to be given to the Indians when, etc.
Portion of annuities may be paid for debts, etc.
Proviso.
Proviso.
Grants of land to Charles F. Picotte, Zephyr Rencontre, Paul Dorian, and others.
Persons other than Indians or mixed bloods may enter 160 acres at $1.25 per acre.
Yankton to be secure in the use of the red pipestone quarry.
United States may maintain military posts, etc.
No trade with Indians unless licensed.
Land not to be alienated except, etc.
The Yankton to preserve friendly relations.
Surrender of offenders.
Tribal annuities to be withheld if intemperate, etc.
Annuities not to be subject to deots, except, etc.
Release of all demands, etc.
Indian agent for Yankton.
Expenses hereof to be borne by the United States.
When to take effect.

*Articles of agreement and convention made and concluded at the city of Washington, this nineteenth day of April. A. D. one thousand eight hundred and fifty-eight, by Charles E. Mix. commissioner on the part of the United States, and the following-named chiefs and delegates of the Yancton tribe of Sioux or Dacotah Indians, viz:*
*Pa-ia-ne-a-pa-pe. the man that was struck by the Ree.*

*Ma-to-sa-be-che-a, the smutty bear.*
*Charles F. Picotte, Eta-ke-cha.*
*Ta-ton-ka-wete-co, the crazy bull.*
*Pse-cha-wa-kea, the jumping thunder.*
*Ma-ra-ha-ton, the iron horn.*
*Mombe-kah-pah, one that knocks down two.*
*Ta-ton-ka-e-yah-ka, the fast bull.*
*A-ha-ka-ma-ne, the walking elk.*
*A-ha-ka-na-zhe, the standing elk.*
*A-ha-ka-ho-che-cha, the elk with a bad voice.*
*Cha-ton-wo-ka-pa, the grabbing hawk.*
*E-ha-we-cha-sha, the owl man.*
*Pla-son-wa-kan-na-ge, the white medicine cow that stands.*
*Ma-ga-scha-che-ka, the little white swan.*
*Oke-che-la-wash-ta, the pretty boy.*
*(The three last names signed by their duly-authorized agent and rep- resentative,*
*Charles F. Picotte,) they being thereto duly authorized and empowered by said tribe of*
*Indians.*

ARTICLE 1.

The said chiefs and delegates of said tribe of Indians do hereby cede and relinquish to the United States all the lands now owned, possessed, or claimed by them, wherever situated, except four hundred thousand acres thereof, situated and described as follows, to wit—Beginning at the mouth of the Naw-izi-wa-koo-pah or Chouteau River and extending up the Missouri River thirty miles: thence due north to a point; thence easterly to a point on the said Chouteau River; thence down said river to the place of beginning, so as to include the said quantity of four hundred thousand acres. They, also, hereby relinquish and abandon all claims and complaints about or growing out of any and all treaties heretofore made by them or other Indians, except their annuity rights under the treaty of Laramie, of September 17, A. D. 1851.

ARTICLE 2.

The land so ceded and relinquished by the said chiefs and delegates of the said tribe of Yanctons is and shall be known and described as follows, to wit—
"Beginning at the mouth of the Tchan-kas-an-data or Calumet or Big Sioux River; thence up the Missouri River to the mouth of the Pa-hah-wa-kan or East Medicine Knoll River; thence up said river to its head; thence in a direction to the head of the main fork of the Wan-dush-kah-for or Snake River; thence down said river to its junction with the Tchan-san-san or Jaques or James River; thence in a direct line to the northern point of Lake Kampeska; thence along the northern shore of said lake and its outlet to the junction of said outlet with the said Big Sioux River; thence down the Big Sioux River to its junction with the Missouri River."
And they also cede and relinquish to the United States all their right and title to and in all the islands of the Missouri River, from the mouth of the Big Sioux to the mouth of the Medicine Knoll River.
And the said chiefs and delegates hereby stipulate and agree that all the lands embraced in said limits are their own, and that they have full and exclusive right to cede and relinquish the same to the United States.

[*777]

2

ARTICLE 3.

The said chiefs and delegates hereby further stipulate and agree that the United States may construct and use such roads as may be hereafter necessary across their said reservation by the consent and permission of the Secretary of the Interior, and by first paying the said Indians all damages and the fair value of the land so used for said road or roads, which said damages and value shall be determined in such manner as the Secretary of the Interior may direct. And the said Yanctons hereby agree to *remove* and *settle* and *reside* on said reservation within one year from this date, and, until they do so remove, (if within said year,) the United States guarantee them in the quiet and undisturbed possession of their present settlements.

ARTICLE 4.

In consideration of the foregoing cession, relinquishment, and agreements, the United States do hereby agree and stipulate as follows, to wit:

1st. To protect the said Yanctons in the quiet and peaceable possession of the said tract of four hundred thousand acres of land so reserved for their future home, and also their persons and property thereon during good behavior on their part.

2d. To pay to them, or expend for their benefit, the sum of sixty- five thousand dollars per annum, for ten years, commencing with the year in which they shall remove to, and settle and reside upon, their said reservation—forty thousand dollars per annum for and during ten years thereafter—twenty-five thousand dollars per annum for and during ten years thereafter—and fifteen thousand dollars per annum for and during twenty years thereafter; making *one million and six hundred thousand dollars in annuities in the period of fifty years*, of which sums the President of the United States shall, from time to time, determine what proportion shall be paid to said Indians, in cash, and what proportion shall be expended for their benefit, and, also, in what manner and for what objects such expenditure shall be made, due regard being had in making such determination to the best interests of said Indians. He shall likewise exercise the power to make such provision out of said sums as he may deem to be necessary and proper for the support and comfort of the aged or infirm, and helpless orphans of the said Indians. In case of any material decrease of said Indians, in number, the said amounts may, in the discretion of the President of the United States, be diminished and reduced in proportion thereto— or they may, at the discretion of the President of the United States, be discontinued entirely, should said Indians fail to make reasonable and satisfactory efforts to advance and improve their condition, in which case, such other provisions shall be made for them as the President and Congress may judge to be suitable and proper.

3d. In addition to the foregoing sum of one million and six hundred thousand dollars as annuities, to be paid to or expended for the benefit of said Indians, during the period of fifty years, as before stated, the United States hereby stipulate and agree to expend for their benefit the sum of fifty thousand dollars more, as follows, to wit: Twenty-five thousand dollars in maintaining and subsisting the said Indians during the first year after their removal to and permanent settlement upon their said reservation; in the purchase of stock, agricultural implements, or other articles of a beneficial character, and in breaking up and fencing land; in the erection of houses, store-houses, or other needful buildings, or in making such other improvements as may be necessary for their comfort and welfare.

4th. To expend ten thousand dollars to build a school-house or school-houses, and to establish and maintain one or more normal-labor schools (so far as said sum will go) for the education and training of the children of said Indians in letters, agriculture, the mechanic arts, and housewifery, which school or schools shall be managed and conducted in such manner as the Secretary of the Interior shall direct. The said

[*778]

Indians hereby stipulating to keep constantly thereat, during at least nine months in the year, all their children between the ages of seven and eighteen years; and if any of the parents, or others having the care of children, shall refuse or neglect to send them to school, such parts of their annuities as the Secretary of the Interior may direct, shall be withheld from them and applied as he may deem just and proper; and such further sum, in addition to the said ten thousand dollars, as shall be deemed necessary and proper by the President of the United States, shall be reserved and taken from their said annuities, and applied annually, during the pleasure of the President to the support of said schools, and to furnish said Indians with assistance and aid and instruction in agricultural and mechanical pursuits, including the working of the mills, hereafter mentioned, as the Secretary of the Interior may consider necessary and advantageous for said Indians; and all instruction in reading shall be in the English language. And the said Indians hereby stipulate to furnish, from amongst themselves, the number of young men that may be required as apprentices and assistants in the mills and mechanic shops, and at least three persons to work constantly with each white laborer employed for them in agriculture and mechanical pursuits, it being understood that such white laborers and assistants as may be so employed *are* thus employed more for the instruction of the said Indians than merely to work for their benefit: and that the laborers so to be furnished by the Indians may be allowed a fair and just compensation for their services, to be fixed by the Secretary of the Interior, and to be paid out of the shares of annuity of such Indians as are able to work, but refuse or neglect to do so. And whenever the President of the United States shall become satisfied of a failure, on the part of said Indians, to full fill the aforesaid stipulations, he may, at his discretion, discontinue the allowance and expenditure of the sums so provided and set apart for said school or schools, and assistance and instruction.

5th. To provide the said Indians with a mill suitable for grinding grain and sawing timber; one or more mechanic shops, with the necessary tools for the same; and dwelling-houses for an interpreter, miller, engineer for the mill, (if one be necessary,) a farmer, and the mechanics that may be employed for their benefit, and to expend therefor a sum not exceeding fifteen thousand dollars.

ARTICLE 5.

Said Indians further stipulate and bind themselves to prevent any of the members of their tribe from destroying or injuring the said houses, shops, mills, machinery, stock, farming-utensils, or any other thing furnished them by the Government, and in case of any such destruction or injury of any of the things so furnished, or their being carried off by any member or members of their tribe, the value of the same shall be deducted from their general annuity; and whenever the Secretary of the Interior shall be satisfied that said Indians have become sufficiently confirmed in habits of industry and advanced in the acquisition of a practical knowledge of agriculture and the mechanic arts to provide for themselves, he may, at his discretion, cause to be turned over to them all of the said houses and other property furnished them by the United States, and dispense with the services of any or all persons herein before stipulated to be employed for their benefit, assistance, and instruction.

ARTICLE 6.

It is hereby agreed and understood that the chiefs and head-men of said tribe may, at their discretion, in open council, authorize to be paid *out of their said annuities* such a sum or sums as may be found to be necessary and proper, not exceeding in the

4

aggregate one hundred and fifty thousand dollars, to satisfy their just debts and obligations, and to provide for such of their half-breed relations as do not live with them, or draw any part of the said annuities of said Indians: *Provided, however,* That their said determinations shall be approved by their agent for the time being, and the said payments authorized

[*779]

by the Secretary of the Interior: *Provided, also,* That there shall not be so paid out of their said annuities in any one year, a sum exceeding fifteen thousand dollars.

### ARTICLE 7.

On account of their valuable services and liberality to the Yanctons, there shall be granted in fee to Charles F. Picotte and Zephyr Rencontre, each, one section of six hundred and forty acres of land, and to Paul Dorian one-half a section; and to the half-breed Yancton, wife of Charles Reulo, and her two sisters, the wives of Eli Bedaud and Augustus Traverse, and to Louis Le Count, each, one-half a section. The said grants shall be selected in said ceded territory, and shall not be within said reservation, nor shall they interfere in any way with the improvements of such persons as are on the lands ceded above by authority of law; and all other persons (other than Indians, or mixed-bloods) who are now residing within said ceded country, by authority of law, shall have the privilege of entering one hundred and sixty acres thereof, to include each of their residences or improvements, at the rate of one dollar and twenty-five cents per acre.

### ARTICLE 8.

The said Yancton Indians shall be secured in the free and unrestricted use of the red pipe-stone quarry, or so much thereof as they have been accustomed to frequent and use for the purpose of procuring stone for pipes; and the United States hereby stipulate and agree to cause to be surveyed and marked so much thereof as shall be necessary and proper for that purpose, and retain the same and keep it open and free to the Indians to visit and procure stone for pipes so long as they shall desire.

### ARTICLE 9.

The United States shall have the right to establish and maintain such military posts, roads, and Indian agencies as may be deemed necessary within the tract of country herein reserved for the use of the Yanctons: but no greater quantity of land or timber shall be used for said purposes than shall be actually requisite; and if, in the establishment or maintenance of such posts, roads, and agencies, the property of any Yancton shall be taken, injured, or destroyed, just and adequate compensation shall be made therefor by the United States.

### ARTICLE 10.

No white person, unless in the employment of the United States, or duly licensed to trade with the Yanctons, or members of the families of such persons, shall be permitted to reside or make any settlement upon any part of the tract herein reserved for said Indians, nor shall said Indians alienate, sell, or in any manner dispose of any portion thereof, except to the United States. Whenever the Secretary of the Interior shall direct, said tract shall be surveyed and divided as he shall think proper among said Indians, so as to give to each head of a family or single person a separate farm, with such rights of possession

5

or transfer to any other member of the tribe or of descent to their heirs and representatives as he may deem just.

ARTICLE 11.

The Yanctons acknowledge their dependence upon the Government of the United States, and do hereby pledge and bind themselves to preserve friendly relations with the citizens thereof, and to commit no injuries or depredations on their persons or property, nor on those of members of any other tribe or nation of *of* Indians; and in case of any such injuries or depredations by said Yanctons, full compensation shall, as far as possible, be made therefor out of their tribal annuities, the amount in all cases to be determined by the Secretary of the Interior. They further pledge themselves not to engage in hostilities with any other tribe or nation, unless in self-defence, but to submit, through their agent, all matters of dispute and difficulty between themselves and other Indians for the decision of the President of the United States, and to acquiesce in and abide thereby. They also agree to deliver, to the proper officer of the United States all offenders against the treaties, laws, or regulations of the United States, and to assist in discovering, pursuing, and capturing all such offenders,

[*780]

who may be within the limits of their reservation, whenever required to do so by such officer.

ARTICLE 12.

To aid in preventing the evils of intemperance, it is hereby stipulated that if any of the Yanctons shall drink, or procure for others, intoxicating liquor, their proportion of the tribal annuities shall be withheld from them for at least one year; and for a violation of any of the stipulations of this agreement on the part of the Yanctons they shall be liable to have their annuities withheld, in whole or in part, and for such length of time as the President of the United States shall direct.

ARTICLE 13.

No part of the annuities of the Yanctons shall be taken to pay any debts, claims, or demands against them, except such existing claims and demands as have been herein provided for, and except such as may arise under this agreement, or under the trade and inter-course laws of the United States.

ARTICLE 14.

The said Yanctons do hereby fully acquit and release the United States from all demands against them on the part of said tribe, or any individual thereof, except the beforementioned right of the Yanctons to receive an annuity under said treaty of Laramie, and except, also, such as are herein stipulated and provided for.

ARTICLE 15.

For the special benefit of the Yanctons, parties to this agreement, the United States agree to appoint an agent for them, who shall reside on their said reservation, and shall have set apart for his sole use and occupation, at such a point as the Secretary of the

6

Interior may direct, one hundred and sixty acres of land.

ARTICLE 16.

All the expenses of the making of this agreement, and of surveying the said Yancton reservation, and of surveying and marking said pipe-stone quarry, shall be paid by the United States.

ARTICLE 17.

This instrument shall take effect and be obligatory upon the contracting parties whenever ratified by the Senate and the President of the United States.
In testimony whereof, the said Charles E. Mix, commissioner, as aforesaid, and the undersigned chiefs, delegates, and representatives of the said tribe of Yancton Indians, have hereunto set their hands and seals at the place and on the day first above written.

Charles E. Mix, Commissioner. [L. S.]
Pa-la-ne-apa-pe, or the Man that was struck by the Ree, his x mark. [L. S.]
Ma-to-sa-be-che-a, or the Smutty Bear, his x mark. [L. S.]
Charles F. Picotte, or Eta-ke-cha. [L. S.]
Ta-ton-ka-wete-co, or the Crazy Bull, his x mark. [L. S.]
Pse-cha-wa-kea, or the Jumping Thunder, his x mark. [L. S.]
Ma-ra-ha-ton, or the Iron Horn, his x mark. [L. S.]
Nombe-kah-pah, or One that knocks down two, his x mark. [L. S.]
Ta-ton-ka-e-yah-ka, or the Fast Bull, his x mark. [L. S.]
A-ha-ka Ma-ne, or the Walking Elk, his x mark. [L. S.]
A-ha-ka-na-zhe, or the Standing Elk, his x mark. [L. S.]
A-ha-ka-ho-che-cha, or the Elk with a bad voice, his x mark. [L. S.]
Cha-ton-wo-ka-pa, or the Grabbing Hawk, his x mark. [L. S.]
E-ha-we-cha-sha, or the Owl Man, his x mark. [L. S.]
Pla-son-wa-kan-na-ge, or the White Medicine Cow that stands, by his duly authorized delegate and representative, Charles F. Picotte. [L. S.]
Ma-ga-scha-che-ka, or the Little White Swan, by his duly authorized delegate and representative, Charles F. Picotte. [L. S.]
O-ke-che-la-wash-ta, or the Pretty Boy, by his duly authorized delegate and representative, Chas. F. Picotte. [L. S.]

Executed in the presence of—

A. H. Redfield, agent.
J. B. S. Todd.
Theophile Bruguier.
John Dowling.
Fr. Schmidt.
John W. Wells.
D. Walker.
E. B. Grayson.
S. J. Johnson.
George P. Mapes.
H. Bittinger.
D. C. Davis.
Zephier Roncontre, his x mark, United States interpreter.

[*781]

7

Witness:
J. B. S. Todd,
Paul Dorain, his x mark.
Charles Rulo, his x mark.

Witness:
J. B. S. Todd.

---

Vol. II, Pages 776-781 | Page 777 | Page 778 | Page 779 | Page 780 | Page 781 | Top of Treaty

---

Search | OSU Library Digitization Center

Produced by the Oklahoma State University Library
Generous support provided by The Coca-Cola Foundation, Atlanta, GA
URL: http://digital.library.okstate.edu/kappler/

Comments to: lib-dig@okstate.edu

APPENDIX B

pita per

ied only
: schools
id Junc-
ols. The
S. Dak.;
e list. It
hool de-


primary
: lack of
inection

re camp
brought
will the

rom the
d more

in the
g those
primary
e most
als. No
use of

en in a
les and

e fixed.
of the
prima-

## Report of Commissioner of
## Indian Affairs T. J. Morgan
## September 5, 1890

### (Excerpt from *Report for 1890*, pp. iii ff.)

*By 1890 the United States Government was confident that it had its Indian policy on a correct course. As the commissioner's annual report phrased it: "It has become the settled policy of the Government to break up reservations, destroy tribal relations, settle Indians upon their own homesteads, incorporate them into the national life, and deal with them not as nations or tribes or bands, but as individual citizens. The American Indian is to become the Indian American." The commissioner's report outlined in exquisite detail the process by which that "Settled Policy" was to be carried out, and even designated that the day on which the Dawes Severalty Act was signed into law, February 8, 1887, was to be a day for celebration and commemoration in the Indian schools. The optimism and good will evident in the anticipation of benevolent change are too obvious to deny. Yet, in a sense, this benevolent change provided an unconscious veneer to the stronger motives which underlay this shift in American Indian policy. Those motives can perhaps best be put in terms of white land hunger and white cultural imperialism.*

THE LAW PRESCRIBES that the Commissioner "shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs, and of all matters arising out of Indian relations." He is charged with the annual disbursement of more than $7,000,000 and with the purchase and distribution of great quantities of subsistence, clothing, agricultural, medical, and other supplies. He gives instructions to more than sixty agents, supervises their work, examines their accounts, decides perplexing questions arising constantly in the course of administration of agency affairs, and through them oversees in detail the various lines of civilization inaugurated among the tribes, farming, stock-raising, building of houses, Indian police and courts, social and sanitary regulations, etc. He determines upon the appointment and removal of over twenty-five hundred agency and school employes, and appoints traders and physicians. Licensed trade among Indians is under his exclusive control.

He considers and determines all questions of law arising in reference to Indian lands; the legal status of Indians with reference to each other and to white people; the conflicts between local or State laws and tribal customs, and between State and Federal laws; also questions of citizenship, guardianship, crimes, misdemeanors; the prosecution of persons for the sale of

9

1912
Law Library

whisky to Indians; taxation; water rights; right of way of railroads; cattle grazing; conveyances of land; contracts between Indians and whites; sales of timber on Indian reservations; allotment of land, etc. Many of these questions, especially those relating to lands, are of great intricacy, involving interpretations of treaties and laws as far back as colonial times.

He is charged with the duty of organizing a plan of education, with all which that implies; the erecting of school houses, appointing of teachers, and the keeping of a watchful oversight over all Indian school matters.

Bills in Congress relating to Indian affairs are usually referred to the Indian Bureau for information and report, and before an act is signed by the President it is generally referred to the Commissioner for report as to whether there is any reason why it should not receive Executive approval. Original bills and reports are also prepared by the Indian Office for transmission to Congress.

Under the act of March 3, 1885, the Commissioner examines and reports to the Secretary of the Interior on all depredation claims, amounting to many millions of dollars, which have been filed in the Bureau during the last forty years.

The foregoing gives an approximate idea of the responsible duties and the varied character of the work performed under his direction and supervision. The duties and labors of the office are constantly increasing and becoming more arduous and difficult as the progress of Indian civilization makes it necessary to deal with the race, not in their collective capacity as tribes and bands, but with the individuals who are being led to the holding of separate estates, thus multiplying many fold the interests to be considered, developed, and protected.

## DIFFICULTIES OF THE SITUATION

I have cited these duties somewhat in detail, because I desire to set forth some of the difficulties which seriously embarrass and limit their satisfactory discharge. The chief one is the lack of sufficient and proper help in the Bureau itself. The nature of the work requires clerical help of a high order. In addition to the force now employed there is needed a chief clerk, who shall be charged with a general oversight of all the correspondence, and who shall follow up important matters from their beginning until the final result is reached.

There should be a solicitor to whom difficult law questions can be referred, and whose special business it shall be to examine and report upon all claims for money presented by Indians. Such an officer might save to the Government thousands of dollars, and at the same time assist the Indians to obtain their just dues. This would obviate the apparent necessity of so many paid attorneys, employed by the Indians at large fees, to prosecute their claims before the office and before Congress.

There is urgently needed at once the following additional clerical help: One clerk of class 4, two of class 3, and three of class 2; also one medical

expert, charged with an oversight of the sanitary condition of the Indians. Without sufficient help in the office it is simply impossible to have the work done as it should be. Those now employed are faithful, industrious, and generally competent, but the work is too much for them and must and does suffer. The Commissioner is painfully aware of this fact, but is powerless to help it.

The Indians, with whose welfare and civilization he is charged, are widely scattered, and the territory in what is known as Indian reservations embraces not less than 181,000 square miles. The Navajo Reservation is in extent almost an empire in itself—12,800 square miles. The means of communication between the Bureau and the agents are at best imperfect, and in some instances very unsatisfactory. It is impossible for the Commissioner to visit and inspect all the agencies, he can not always rely upon official reports, and it is often very difficult even for the agents to have a personal knowledge of the territory and the people over whom they are placed.

A great obstacle is found in the strange languages still used by most tribes. They communicate with their agents and with the Bureau through interpreters, who, in some instances, are entirely incompetent for an intelligent transaction of business. Further, the various tribes differ so essentially among themselves in languages, habits, and customs, as well as in environment, as to make it very hard to adapt to their varying necessities any policy which may be adopted.

The entire system of dealing with them is vicious, involving, as it does, the installing of agents, with semi-despotic power over ignorant, superstitious, and helpless subjects; the keeping of thousands of them on reservations practically as prisoners, isolated from civilized life and dominated by fear and force; the issue of rations and annuities, which inevitably tends to breed pauperism; the disbursement of millions of dollars worth of supplies by contract, which invites fraud; the maintenance of a system of licensed trade, which stimulates cupidity and extortion, etc.

The small salaries paid to agents and physicians renders it very difficult to procure the services of thoroughly efficient and honest men who are contented to devote their entire energies to the good of the service without hope of other reward than their meager salaries.

The still all too prevalent public sentiment which looks upon Indians with contempt and regards them as the legitimate spoil of white men, has its influence in lowering the grade of this branch of the public service.

The white people who hang on the borders of the reservations, those who have allied themselves by marriage with the tribes, and even those who have from time to time been in Government employ, have, in many cases certainly, presented to the Indians a type of character and a practical philosophy of life on a par with, if not inferior, to their own.

The natural conservatism of the Indians, which leads them to cling with tenacity to their superstitious and inherited practices, adds to the difficulty of inducing them to abandon their own and accept the white man's ways.

### A Hopeful Outlook

Notwithstanding all these hindrances, however, there has been for ten or more years real progress in the right direction, and the outlook for the future is encouraging. The following-points are especially worthy of consideration, and need to be repeated and emphasized until they are fully recognized by both white and Indians:

It has become the settled policy of the Government to break up reservations, destroy tribal relations, settle Indians upon their own homesteads, incorporate them into the national life, and deal with them not as nations or tribes or bands, but as individual citizens. The American Indian is to become the Indian American. How far this process has advanced during the past year will be shown under the head of the reduction of reservations and allotment of lands.

A public-school system is being rapidly provided, whereby every accessible Indian boy and girl of school age is to be afforded an opportunity of acquiring the rudiments of an English education and the elements of an honorable calling. What progress has been made in this direction during the last year is discussed under the general topic of education.

The Indians themselves are coming to understand the present policy of the Government and are showing an increasing readiness and even desire to adjust themselves to it. During the past year I have had personal interviews with prominent chiefs and representative Indians from Wisconsin, North and South Dakota, Oregon, Arizona, New Mexico, Oklahoma, and Indian Territory, and I have been much gratified with their intelligent apprehension of the situation and with the willingness exhibited, as a general thing, to accept lands in severalty with individual citizenship. Almost without exception they have pleaded with me for more and better schools.

Another fact of significance is the growing recognition on the part of Western people that the Indians of their respective States and Territories are to remain permanently and become absorbed into the population as citizens. While demanding the application of the principle of "home rule" in the selection of agents and other employes from the State or Territory in which the Indians are located, I think they also recognize the obligations which they thereby assume to recommend only suitable persons for appointment. If the Indians of South Dakota, for instance, are to remain forever within the limits of the State, either as a burden and a menace, or as an intelligent, self-supporting, co-operative factor in State life, no others except the Indians themselves can have so deep an interest in their practical status as the people by whom they are surrounded.

There is also a growing popular recognition of the fact that it is the duty of the Government, and of the several States where they are located, to make ample provision for the secular and industrial education of the rising generation, leaving the churches free to prosecute with renewed vigor their legitimate work of establishing and maintaining religious missions. By this harmonious and yet separate activity of the Government and the churches

all of the Indians will eventually be brought into right relations with their white neighbors, and be prepared for the privileges and responsibilities of American Christian citizenship.

## SUMMARY OF IMPROVEMENTS ATTEMPTED

In addition to the ordinary routine work of the office, the points to which I have given special attention during the year have been the following:

*The improvement of the personnel of the service.*—Wherever it could be done without too great hardship I have endeavored to remove those who were immoral, incompetent, inefficient, or unfaithful. No one has been discharged on account of politics or religion, and in no single instance except for the improvement of the service. I have steadily refused to remove those who were performing their duties satisfactorily. In making appointments I have, so far as it lay in my power, endeavored to secure persons of good moral character, having special fitness for their work, and where mistakes have been made, I have not been slow to correct them. Allow me, in this connection, to recognize heartily the cordial support given to me in this matter by yourself and the President, and also the painstaking efforts you have both put forth in the selection of Presidential appointees.

*The elevation of the schools.*—A great deal of thought has been given to this subject, and the schools have been visited and inspected with a care and thoroughness hitherto unattempted. The work accomplished by superintendent Dorchester will appear in his report on page 246. Large and careful expenditures have been made in repairing and enlarging school-houses and providing them with proper equipments, and new ones have been erected where most urgently demanded. A new and carefully revised system of rules, including a course of study, has been drawn up and a series of text-books determined upon. A work of this kind is beset with many difficulties and necessarily proceeds slowly, but when once accomplished is enduring.

*The development of industries.*—Great improvements have been made at the Government schools in this important direction. Competent instruction is given to boys in blacksmithing, broom-making, carpentering, dairying, farming, fruit culture, harness-making, printing, tailoring, tinsmithing, shoe-making, stock-raising, wagon-making, and wheel-wrighting; to girls, in all the ordinary duties of housekeeping. The work accomplished among the older Indians in teaching them the arts of agriculture are discussed under the head of Indian farming.

*The improvement of the sanitary service.*—There is a widely prevalent, but very mistaken, notion that the Indians, children of nature, are a healthy, rugged people. Nothing can be further from the truth. They are the sport of disease, are well-nigh helpless in their struggles against the elements, are almost wholly ignorant of the laws of health, are careless of their persons, are dominated by senseless superstitions, are the victims of the crudest kinds of quackery, and perish by hundreds during the prevalence of an epidemic.

*The modification of the ration system.*—Heretofore Indians receiving rations have been required to go to the agencies to get them, thus involving a great waste of time and strength. The plan of issuing rations at substations, which is now being put into operation, is discussed more at length under the head of Indian farming.

The common method of issuing live beeves to the Indians is a relic of barbarism, cruel and filthy. Stringent orders have been issued for the correction of this great evil and proper facilities for slaughtering are now being provided.

*Inculcation of patriotism.*—On all Government schools the American flag has been displayed, national holidays have been duly celebrated, the pupils are learning patriotic songs and recitations, and are taught to love the great nation of which they are a part, and to feel that the people of the United States are their friends and not their enemies.

*Discouraging the Wild West Show business.*—I have refused to grant any more licenses for Indians to leave the reservations or to enter into any other contracts with showmen. I have instituted proceedings against showmen and their bondsmen to compel the fulfillment of former contracts, which required them to treat their employés with humanity and justice.

## EDUCATION

In my supplemental report of last year I set forth quite in detail my views regarding Indian education. These views have met with most gratifying acceptance, and have awakened a great deal of interest among all classes of citizens. The plan there outlined has received the indorsement of Dr. W. T. Harris, United States Commissioner of Education, and of General John Eaton, ex-Commissioner of Education, and has been heartily approved by the National Educational Association, the American Institute of Instruction, the New York State Teachers' Association, and other leading educational bodies, besides receiving the warm commendation of distinguished educators and philanthrophic organizations, like the Mohonk Conference, the Indian Rights Association, etc. After a year's practical work in carrying out the ideas there expressed, I see no reason to modify them in any essential particular.

### TRAINING SCHOOLS

Under the fostering care of the Government a series of training schools has grown up off reservations where, in addition to the ordinary English education, Indian pupils are trained to habits of industry.

*List of training schools with their location, date of opening, and capacity.*

| Name | Location | Date of opening | Capacity |
|---|---|---|---|
| Carlisle | Pennsylvania | 1879 | 500 |
| Salem | Oregon | 1880 | 256 |
| Genoa | Nebraska | 1884 | 250 |

| Name | Location | Date of opening | Capacity |
|------|----------|----------------|----------|
| Haskell Institute | Lawrence, Kans | 1884 | 450 |
| Chilocco | Oklahoma | 1884 | 200 |
| Grand Junction | Colorado | 1886 | 60 |
| Albuquerque | New Mexico | 1886 | 225 |
| Carson | Nevada | 1890 | 150 |
| Santa Fé | New Mexico | 1890 | 125 |
| Pierre | South Dakota | 1890 | 90 |
| Fort Totten | North Dakota | 1890 | 250 |

*Showing attendance, cost, etc., of training schools during fiscal year ended June 30, 1890.*

| Name of school | Location | Rate per annum | Capacity | Number of employes | Enrollment | Average attendance | Cost to Government |
|------|----------|------|------|------|------|------|------|
| Albuquerque Training | Albuquerque, N. Mex | $175.00 | 225 | 28 | 222 | 164 | 27,224.36 |
| Carlisle Training | Carlisle, Pa | 167.00 | 500 | 64 | 789 | 702 | 100,074.34 |
| Chemawa Training | Near Salem, Oregon | 175.00 | 250 | 33 | 194 | 169 | 30,058.28 |
| Chilocco Training | Chilocco, Oklahoma | 175.00 | 200 | 27 | 196 | 154 | 27,093.21 |
| Genoa Training | Genoa, Nebr | 175.00 | 250 | 23 | 203 | 176 | 31,351.66 |
| Grand Junction Training | Grand Junction, Colo | 175.00 | 60 | 9 | 48 | 38 | 9,428.12 |
| Haskell Institute | Lawrence, Kans | 175.00 | 450 | 54 | 460 | 417 | 75,961.62 |
|   Total | | | 1,935 | 238 | 2,112 | 1,818 | 301,691.59 |

For the fiscal year ending June 30, 1891, Congress has made liberal appropriations for these schools which will help the Office to put them on a broad basis, and thoroughly equip them for their important work. With the improvements now being made they will be able next year to care for not less than thirty-three hundred students.

In estimating the work done several things should be carefully borne in mind: These institutions are not universities, nor colleges, nor academies nor high schools. In the best of them the work done is not above that of an ordinary grammar school, while in most it is of the primary or intermediate grade.

The pupils come to them for the most part ignorant of the English language, unaccustomed to study, impatient of restraint, and bringing with them many of the vices and degraded habits of camp life. From the very necessities of the case, the length of time which most of them have been kept in school has been very short. The time required for children in the public schools to complete a course of study embraced in the primary, intermediate, grammar, and high school is from fourteen to fifteen years. It has been heretofore commonly supposed that three years was long enough to educate an Indian and fit him to compete with his white neighbor, who has enjoyed so much greater advantages.

The work, embracing as it necessarily does, the supplanting of a foreign language by the English, the destruction of barbarous habits by the substitution of civilized manners, the displacement of heathenish superstitions by the inculcation of moral principles, the awakening of sluggish minds to intellectual activity by wise mental training and the impartation of useful knowledge, has been undertaken by these Indian teachers almost single-handed and alone, unaided by those potent factors outside of school which play so large a part in the education of our own children.

Law Library

It is a fact not to be forgotten in any discussion of popular education that the most important factors in the development of our American civilization have been in the colleges, universities, and professional schools. Without these there would have been no common schools. If the average of intelligence among the Indians is to be brought up to the level of that of the other peoples which compose our nation, and they are to be prepared to compete in life's struggles on an equal basis, provision must be made whereby those among them who are specially gifted with talent, ambition, and energy may procure a higher education than is offered to them in the reservation and training schools. Already a very considerable number have shown both the desire and ability to pursue higher studies. Several are now successfully teaching, or fitting themselves to teach, others are practicing medicine, some are preaching, and still others are preparing for the practice of law. The desire for these higher studies is steadily increasing and only needs a little fostering to be productive of the best results. A common school, industrial education for all, a liberal and professional education for the worthy few, with a fair field and free competition, is all that is asked for Indians as for others.

The outing system which brings Indian youth into intimate and vital relationship with civilized communities is now steadily developing and is productive of the most hopeful results. During the past year Carlisle has accommodated nearly eight hundred pupils, more than half of whom have had the inestimable advantage of living and working, for periods varying from a few weeks to several months, with Pennsylvania farmers and others, who have paid them a reasonable compensation. Their work has been very satisfactory, and the school has been unable to meet the demand made upon it for help. When the present plans for increasing its capacity are completed, not less than a thousand pupils can be cared for at this one institution, and so far as I can now see it will be entirely feasible to carry perhaps double this number. Every Indian boy or girl who secures a place to work at fair wages has become a producer, and is practically independent and self-supporting.

The superintendent of Haskell Institute writes me that he expects to be able, when the present plans for that school are completed, to care for one thousand students, and to provide homes for a large number of them among Kansas farmers. How far it will be possible to extend the outing system in connection with these training schools I am not prepared to say, but the system seems to have great possibilities, and its development shall receive my constant and careful attention.

These training schools, removed from reservations, offer to the pupils opportunities which can not by any possibility be afforded them in the reservation schools. The atmosphere about them is uplifting, they are surrounded by the object lessons of civilization; they are entirely removed from the dreadful down-pull of the camp. If the entire rising generation could be taken at once and placed in such institutions, kept there long

enough to be well educated and then, if such as choose to do so were encouraged to seek homes among civilized people, there would be no Indian problem.

## RETURNED STUDENTS

It should be especially remembered that the oldest of these training schools, that at Carlisle, Pa., has been in existence only eleven years, and last year graduated its first class. Very few of the graduates have returned to their homes and none of them as yet had any opportunity to show what they can do. The unfairness of some of the criticisms upon returned students, who are inaccurately denominated "Carlisle graduates," or "graduates of the Carlisle University," is apparent. There has been no time in which to estimate from practical experience the influence which has been exerted upon these pupils. The time has not been too short, however, to show that, notwithstanding all the hindrances under which the work is carried forward, Indian children, under equally favorably conditions, are just as susceptible of education as any other class.

Relatively to the Indian population, a very small proportion of boys and girls have yet been brought under the influence of these schools. The few who have returned home have therefore found themselves in too many cases isolated by their dress and habits, out of sympathy with their surroundings, ostracized by their companions, and too frequently practically helpless. The remedy for this is two-fold. First, the universal education of the rising generation, so that there will be a common bond of sympathy and mutual helpfulness between them. Second, the encouragement of pupils who have finished the course of study in the training schools to seek for themselves homes and employment among civilized people.

Pupils in these schools should be taught that they must depend upon themselves and not expect to be furnished employment by the Government. Ample opportunities are afforded them for acquiring an education, with the expectation that they will prepare themselves to earn their own living. There is no necessity of their returning to the reservations, except as a matter of choice, for all who are intelligent, industrious, honest, and thoroughly capable can secure honorable and remunerative employment among civilized people, which they should be encouraged to seek.

## RESERVATION SCHOOLS

*Boarding schools.*—The following is a list of the sixty-three Government boarding schools on reservations:

Arizona—Colorado River, Fort Mojave, Navajo, Keams Cañon, Pima, San Carlos; California—Fort Yuma; Idaho—Fort Hall, Fort Lapwai, Lemhi; Indian Territory—Quapaw, Seneca; Kansas—Kickapoo, Pottawatomie, Sac and Fox and Iowa; Minnesota—Leech Lake, Red Lake, White Earth; Montana—Blackfeet, Crow, Fort Peck; Nebraska—Omaha, Santee, Winnebago; Nevada—Pyramid Lake, Western Shoshone; New Mexico—Mescalero;

1940 Law Library

North Dakota—Fort Stevenson, Standing Rock(2); Oklahoma—Absentee Shawnee, Arapaho, Cheyenne, Kaw, Kiowa, Osage, Otoe, Pawnee, Ponca, Sac and Fox, Wichita; Oregon—Grande Ronde, Klamath, Siletz, Sinemasho, Umatilla, Warm Springs, Yainax; South Dakota—Cheyenne River, Crow Creek, Lower Brulé, Pine Ridge, Sisseton, Yankton; Utah—Uintah; Washington—Chehalis, Neah Bay, Puyallup, Quinaielt, S'Kokomish, Yakima; Wisconsin—Green Bay; Wyoming—Shoshone.

Concerning these schools it may be said: They have been for the most part poorly equipped. The buildings in many cases were small, cheap, inconvenient, often inadequately furnished, frequently very deficient in ventilation, heating, and water supply. Many had been grossly neglected and were sadly out of repair. During the past year, an earnest effort has been made to improve them by repairs, additions, or new buildings, and by supplying water or heating facilities, as needed. There still remains much to be done, however.

If the work is to be made at all adequate to the necessities of the case, there should be a very considerable increase in the number of these schools, and at an early day new schools should be established at the following places:

Arizona—Fort Apache on San Carlos Reservation; Papago Reservation, Navajo Reservation, and among the Moquis; California—Hoopa Valley Agency, Mission Agency, Round Valley Agency; Colorado—Southern Ute and Jicarilla Agency; Montana—Blackfeet Agency, Tongue River Agency; New Mexico—Zuni Reservation; Oklahoma—Cantonment, Jesse Bent's ranch, and Seger Colony on Cheyenne and Arapaho Reservation; South Dakota—Pine Ridge Reservation, Rosebud Reservation; Utah—Ouray Agency; Wisconsin—Oneida Reservation, and four of the reserves of the La Pointe Agency.

The limit heretofore placed by law upon the cost of the buildings—$10,000—has been so low that it has been impossible to provide proper accommodations. To establish a boarding-school involves making provision not only for school rooms proper, but for dormitories, kitchen, laundry, bath-rooms, hospital, and other necessary rooms for pupils, and also of suitable quarters for all the employes, superintendent, teachers, matron, cook, laundress, seamstress, etc. The original cost of the plant is a comparatively small part of the outlay. It is a poor economy to put up inferior buildings and fail to make proper provision for the work expected, which can not be satisfactorily done with such poor facilities. The limit of cost now fixed is $12,000, which is still too low.

These schools are surrounded by influences which necessarily hamper them very seriously in their work. They are far removed from civilization, feel none of the stimulating effects of an intelligent public sentiment, and have little helpful supervision. The parents have ready access to them, and often prove troublesome guests by reason of their clamors for the return of the children to their tepees. It is exceedingly difficult to break up the use of the tribal tongue and to teach them to use the English language. Notwith-

\bsentee
;, Ponca,
emasho,
:r, Crow
1; Wash-
Yakima;

:he most
, cheap,
cient in
ieglected
ffort has
;, and by
much to

:he case,
schools,
ollowing

:rvation,
1 Valley
ern Ute
Agency;
: Bent's
1; South
—Ouray
f the La

ldings—
proper
rovision
laundry,
also of
matron,
ompara-
inferior
i, which
t of cost

hamper
lization,
ent, and
em, and
eturn of
ie use of
Notwith-

standing these difficulties, however, they are doing a good work, directly upon their pupils and indirectly upon the older people of the reservations, and there goes out from them a civilizing force whose strength and value can scarcely be overestimated.

To render them still more efficient they should be increased in number, be better equipped, more closely supervised, and subjected to more rigid discipline. The teachers should be selected with care, have a reasonably secure tenure of office, and have pay equal to that received for a similar grade of work in the public schools of the same State or Territory. These schools should be feeders for the training schools, and deserving, capable pupils should be regularly and systematically promoted.

*Day schools.*—During the past year there were in operation at the various agencies 106 day schools with an enrollment of 3,967, and an average attendance of 2,367.

Of these schools I wish to say that I found them in existence when I assumed the duties of the office; 11 new ones have been established, and 3 of the old ones have been abandoned. Of the whole number 81 are conducted by the Government and 25 are carried on under contract.

The teachers labor under very great disadvantages. The houses are poor and the furniture scanty. The accommodations for the teachers are very primitive; the isolation and deprivations are hard to bear; the influences of the camps are often wholly antagonistic to those of the schools; it is extremely difficult to break up the use of the tribal language; many of the children are poorly fed, scantily clad, untidy in their habits, and irregular in their attendance.

On the other hand, it must be said that a good day-school well administered is an object lesson of civilization in the midst of barbarism, for the children carry home daily some influence which tends toward a better life. It permits the parents the presence of their children, to which many of them attach great importance, and to whose prolonged absence they could not be induced to consent, and there is gradually being produced, no doubt partly at least through these schools, a public sentiment among the camp Indians more friendly to education and progress in civilization.

I believe it is possible to raise the character of these schools by providing better houses and facilities for work, by introducing some form of elementary industry, and by paying more attention to supervision. The effort to do this is now being made, which, if it is successful, may lead to the establishment of others on a better basis.

### INDIANS IN THE PUBLIC SCHOOLS

Believing that the true purpose of the Government in its dealings with the Indians is to develop them into self-supporting, self-reliant, intelligent, and patriotic citizens, and believing that the public schools are the most effective means of Americanizing our foreign population, I am desirous of bringing the Indian school system into relation with that of the public schools. Not only so, but wherever possible I am placing Indian pupils in

the public schools. Very few are thus far enjoying these advantages, but in a letter addressed to the superintendents of public instruction in the several States and Territories where there are Indians under the care of the National Government I have invited their co-operation, and have offered to contract with school districts for the tuition of Indian pupils at the rate of $10 per quarter.

I think this will prove a very important feature of the work in hand, and confidently expect within a year to be able to report a great advance in this direction. Indian allottees can be provided with educational facilities for their children in no more satisfactory manner, and the tuition paid by the Government aids the school districts to maintain schools in sections of the country where lands in severalty have been taken by the Indians.

### COMPULSORY EDUCATION

My predecessors and many of the agents and superintendents of schools have strongly urged the importance and necessity of a law compelling the attendance of pupils at the schools. I am in favor of compelling every Indian child of suitable age and health, for whom accommodations are provided, to attend school ten months out of twelve. A general law, however, could not now be everywhere applied, for the simple reason that school accommodations are provided by the Government for less than half the children of school age. The question among many tribes is not so much one of filling the schools as it is of finding room for the pupils. With few exceptions every reservation school is crowded, and hundreds of children who are willing to go to school are prevented by want of proper accommodations.

Something in the way of compulsory attendance may be secured through the authority already vested in the agent under direction from this Office, whereby full and regular attendance at school is required upon forfeiture of rations, annuities, or other favors as the penalty for indifference or open opposition. It does not meet the case of the non-reservation schools, however. Under the law children can not be taken from the reservation except by permission of their parents, and although the non-reservation schools are generally better equipped than those at the agencies, at times great difficulty is experienced in inducing pupils and parents to consent to the transfer.

### SCHOOL ATTENDANCE

*Showing enrollment and average attendance at Indian schools for the fiscal years 1887, 1888, 1889, and 1890.*

| Kind of school | Enrolled | | | | Average attendance | | | |
|---|---|---|---|---|---|---|---|---|
| | 1887 | 1888 | 1889 | 1890 | 1887 | 1888 | 1889 | 1890 |
| Government schools: | | | | | | | | |
| Training and boarding........ | 6,847 | 6,998 | 6,797 | 7,236 | 5,276 | 5,533 | 5,212 | 5,644 |

|  | Enrolled | | | | Average attendance | | | |
|---|---|---|---|---|---|---|---|---|
| Day............. | 3,115 | 3,175 | 2,863 | 2,963 | 1,896 | 1,929 | 1,744 | 1,780 |
| Total.......... | 9,962 | 10,173 | 9,660 | 10,199 | 7,172 | 7,462 | 6,956 | 7,424 |
| Contract schools: | | | | | | | | |
| Boarding........ | 2,763 | 3,234 | 4,038 | 4,186 | 2,258 | 2,694 | 3,213 | 3,384 |
| Day............. | 1,044 | 1,293 | 1,307 | 1,004 | 604 | 786 | 662 | 587 |
| Industrial boarding, specially appropriated for.......... | 564 | 512 | 779 | 988 | 486 | 478 | 721 | 837 |
| Total.......... | 4,371 | 5,039 | 6,124 | 6,178 | 3,348 | 3,958 | 4,596 | 4,808 |
| Aggregate...... | 14,333 | 15,212 | 15,784 | 16,377 | 10,520 | 11,420 | 11,552 | 12,232* |

*The average attendance for 1890 is computed on the attendance during the entire year including summer vacations. The average attendance for the nine months from October 1 to June 30, was 12,462, a gain of 1,021 over the corresponding months of the preceding year.

The total enrollment during the year ended June 30, 1890, is 16,377, while the estimated school population (six to sixteen years of age), exclusive of the Indians of New York State and the Five Civilized Tribes, is 36,000.

Many reasons have combined to cause this comparatively small attendance, of which a few may be mentioned. Very inadequate provision has been made. In some cases, as among the Navajos for instance, where there is a school population of 3,600, with accommodations for only 150 pupils, or at San Carlos Agency, where the conditions are similar, I have no doubt that the attendance could be doubled in one year, simply by making provision for the children who can not go to school because there is no school for them to go to. In many places the Indians are impatient in their demands for the schools which the Government has failed to supply them, though in some cases they have been promised for years.

In many instances the facilities have not only been inadequate, but the school-houses have been unattractive and unhealthy and the children have been neglected or badly treated. Great improvements have been made during the year, and others are under way which will insure for next year a considerable increase in attendance.

In some cases the agents have taken little or no interest in the schools, or have been so occupied with other cares that they have done little or nothing to build them up or make them inviting, while in still others the small attendance is directly chargeable to their ignorance, neglect, or even secret opposition. Where this has seemed to be beyond improvement or remedy, I have not hesitated to suggest it to you as a sufficient cause for removal.

One great hindrance is the poor health so common among the Indian children. Disease is very prevalent, and during the last year the ravages of the grippe were very distressing. There were thousands of cases of it, and where it was not necessary actually to suspend the schools the number of

pupils in attendance was very largely decreased. The Indians as a whole suffer especially with pulmonary troubles, sore eyes, and diseases of the skin, and it must be conceded that these conditions offer one of the most serious obstacles to a regular, uniform school attendance.

Another hindrance is, very naturally, the failure of parents and children alike to appreciate the nature and importance of education. They can not see for themselves, and it is difficult to make them understand all it means for them. They either ignore the school entirely or expect it to accomplish wonders in a brief period. Three years they consider a very long time in which a boy or girl should not only fully master the English language, but acquire all the accumulated learning of the white man. Happily, a great change in this respect is taking place, and there is a growing desire among parents as well as among children that the education may be more complete.

If the Government will provide the means to establish and maintain schools in accordance with the system laid down in my supplemental report of last year, it is only a question of time—two or three years I think will suffice—when all Indian youth of school age and of suitable health can be put into school.

The following tables, taken from that report and brought down to date, show the number of Indian pupils who have been attending school since 1882 and the appropriations which have been made for Indian education since 1877.

*Showing Indian school attendance from 1882 to 1890, both inclusive.*

|  | Boarding schools | | Day schools | | Totals | |
| --- | --- | --- | --- | --- | --- | --- |
| Year | Number | Average attendance | Number | Average attendance | Number | Average attendance |
| 1882..... | 71 | 2,755 | 54 | 1,311 | 125 | 4,066 |
| 1883..... | 75 | 2,599 | 64 | 1,443 | 139 | 4,042 |
| 1884..... | 86 | 4,358 | 76 | 1,757 | 162 | 6,115 |
| 1885..... | 114 | 6,201 | 86 | 1,942 | 200 | 8,143 |
| 1886..... | 115 | 7,260 | 99 | 2,370 | 214 | 9,630 |
| 1887..... | 117 | 8,020 | 110 | 2,500 | 227 | 10,520 |
| 1888..... | 126 | 8,705 | 107 | 2,715 | 233 | 11,420 |
| 1889..... | 136 | 9,146 | 103 | 2,406 | 239 | 11,552 |
| 1890..... | 140 | 9,865 | 106 | 2,367 | 246 | 12,232 |

*Annual appropriations made by the Government since the fiscal year 1877 for support of Indian schools.*

| Year | Appropriation | Per cent of increase | Year | Appropriation | Per cent of increase |
| --- | --- | --- | --- | --- | --- |
| 1877........ | $20,000 | ........... | 1885....... | $992,800 | 47 |
| 1878........ | 30,000 | 50 | 1886....... | 1,100,065 | 10 |

| Year | Appropriation | Per cent of increase | Year | Appropriation | Per cent of increase |
|------|------|------|------|------|------|
| 1879........ | 60,000 | 100 | 1887....... | 1,211,415 | 10 |
| 1880........ | 75,000 | 25 | 1888....... | 1,179,916 | 02.6 |
| 1881........ | 75,000 | .......... | 1889....... | 1,348,015 | 14 |
| 1882........ | 135,000 | 80 | 1890....... | 1,364,568 | 01 |
| 1883........ | 487,200 | 260 | 1891........ | 1,842,770 | 35 |
| 1884........ | 675,200 | 38 | | | |

In this connection it is worth while to note the allowances made by the Government to other than Government schools for the education of Indians.

*Showing amounts set apart for various religious bodies for Indian education for each of the fiscal years 1886 to 1891, inclusive.*

| | 1886 | 1887 | 1888 | 1889 | 1890 | 1891 |
|------|------|------|------|------|------|------|
| Roman Catholic............. | $118,343 | $194,635 | $221,169 | $347,672 | $356,957 | $363,349 |
| Presbyterian................ | 32,995 | 37,910 | 36,500 | 41,825 | 47,650 | 44,850 |
| Congregational.............. | 16,121 | 26,696 | 26,080 | 29,310 | 28,459 | 27,271 |
| Martinsburgh, Pa............. | 5,400 | 10,410 | 7,500 | Dropped | ....... | ........ |
| Alaska Training School........ | ....... | 4,175 | 4,175 | ....... | ........ | ........ |
| Episcopal................... | ....... | 1,890 | 3,090 | 18,700 | 24,876 | 29,910 |
| Friends..................... | 1,960 | 27,845 | 14,460 | 23,383 | 23,383 | 24,743 |
| Mennonite.................. | ....... | 3,340 | 2,500 | 3,125 | 4,375 | 4,375 |
| Middletown, Cal.............. | ....... | 1,523 | Dropped | ....... | ........ | ........ |
| Unitarian................... | ....... | 1,350 | 5,400 | 5,400 | 5,400 | 5,400 |
| Lutheran.................... | ....... | ....... | 1,350 | 4,050 | 7,560 | 9,180 |
| Methodist................... | ....... | ....... | ....... | 2,725 | 9,940 | 6,700 |
| Miss Howard................ | ....... | ....... | ....... | 275 | 600 | 1,000 |
| Appropriation for Lincoln Institution................... | 33,400 | 33,400 | 33,400 | 33,400 | 33,400 | 33,400 |
| Appropriation for Hampton Institute.................... | 20,040 | 20,040 | 20,040 | 21,040 | 20,040 | 20,040 |
| Total.................. | 228,259 | 363,214 | 376,264 | 530,905 | 562,640 | 570,218 |

* * *

## HOLIDAYS

As a part of their education and a means of preparation and training for civilized home life and American citizenship, it is important that the pupils in these schools should understand the significance of national holidays and be permitted to enjoy them. To this end general instructions have been issued for the appropriate celebration of New Year's Day, Franchise Day (February 8), Washington's birthday, Decoration Day, Fourth of July, Thanksgiving, and Christmas, as well as Arbor Day.

23

The reports received in reply to these circulars are of unusual interest, showing that both teachers and pupils entered heartily into the spirit of the various occasions. Very creditable programmes of exercises for these different days are on file in the office, in some of which adult Indians took active part, giving good advice to the children, and for the time being, at least, identifying themselves with the new ideas brought forward.

On a few of the reservations Memorial Day could be as fittingly observed as elsewhere, by the decoration of the graves of Indians who enlisted in the United States Army and lost their lives during the war.

Tree planting on Arbor Day was quite extensively engaged in by the schools, and the interest excited led some of the Indians to plant trees around their own houses. The yearly observance of this day can not fail to add greatly to the attractiveness of agency and school premises and to the adornment of Indian homes.

I take pleasure in quoting the interesting account given by Special Agent Alice C. Fletcher of the celebration by the Nez Percés of Idaho of the last Fourth of July:

> The people began to gather a day or two before the Fourth, and to erect their awnings and tents in the pine grove about the church. Over five hundred were present, and the place, otherwise so quiet, resounded with the laughter and chatter of old and young. The day opened with a religious service held at 6 a. m. under a large awning tied to tall trees. At 8 a. m. the children and their parents, all clad in citizens' clothes and decked out in their best, gathered in front of the church, where, on the porch, sat the four elders. Some of the boys carried little flags, and all joined in a song new to me, the words being: "We'll stand, Fourth of July," closing with: "Hurrah! Fourth of July," all the men removing their hats. As I walked about I was greeted with a hand-shake, a nod of the head, and smiles, and "Fourth of July," much as we say "Happy New Year." Soon a procession was formed, the boys leading, and graded as to size; the girls followed, arranged in the same manner down to little tots; then came the men, the women bringing up the rear. The column moved sedately round through the trees, all singing: "We'll stand, Fourth of July," until they returned in front of the church, when all seated themselves, and the native pastor introduced the various speakers—all Indians. These commented on the happiness of an orderly Christian life in contrast to the wild roving life that the people had formerly led, and urged all—both old and young—to be good men and women. One man declared that he did not fully understand what we celebrated, but Fourth of July was to celebrate. Just as a returned student was stepping forth to give the historical data of the day the crier announced that the people must begin to prepare for dinner, and the audience melted at the summons.
>
> The beef and salmon were roasted before large fires, and the meal was served under the awning on table cloths and white china. A blessing was asked, and all fell to with zest. It was a comfortable meal of beef, salmon, canned fruit, bread, cake, and wild potatoes. After dinner the business of adopting certain persons into the tribe was attended to, and in the evening some Indians provided a few fire-works, after which all gathered under the stars for an evening service of prayer, and as happy and peaceful a day as I ever saw came to an end.

The establishing of these new, independent communities will of necessity increase for a time the number of farmers required for their instruction. The estimates submitted by the various agents for such additional farmers as are required for the year ending June 30, 1891, amount to over $62,000. The sum appropriated by Congress is $60,000. In view of the progress now being made, in the allotment of lands, and of the importance that the Indians should be prepared for this step by intelligent instruction in the proper use of their land, and considering that every acre put under cultivation yields a substantial return for the labor and money expended, I recommend that for the fiscal year ending June 30, 1892, the sum of $100,000 be appropriated for the pay of additional farmers.

The Indians should be given distinctly to understand that the employment by the Government of white farmers is a temporary expedient, to be abandoned at an early day. They should be taught that they must very soon depend entirely upon themselves, and that their future prosperity will depend largely upon the use they are now willing to make of the opportunities for learning to farm offered to them by the Government.

## IRRIGATION

Large bodies of lands now included in reservations are practically worthless for farming purposes, without irrigation. The spread of the white population over the public domain, the reduction of reservations, the confining of Indians to ever-narrowing borders, makes the problem of their support one of increasing difficulty and urgency. White people are able to combine in the creation of expensive and extensive irrigating plans, which the Indians can not do. From the attention which I have been able to give to the subject, I am led to believe that by the expenditure of moderate sums of money in constructing reservoirs and irrigating ditches, employing Indians to perform most of the labor, and instructing them in the construction, care, and use of these reservoirs and ditches, large numbers of them may be prepared for self-support. It is my purpose during the coming year to pay special attention to this matter, collect suitable data, and lay before you in my next annual report some plan of operation. The matter can not safely be deferred any longer. What has already been done in this direction warrants belief in the advisability of doing much more.

* * *

## RULES FOR INDIAN SCHOOLS

### *IN GENERAL*

The importance attached to the subject of Indian education is set forth in the following letter addressed by the honorable the Secretary of the Interior to each newly appointed Indian agent:

In connection with your appointment as agent at the ———— agency, I am directed by the President to inform you that the office to which you are appointed is considered one of far more than ordinary importance, both for the interests of the Government and of the Indians who will be brought under your charge and direction; that sobriety and integrity must mark the conduct of every one connected or associated directly or indirectly with the agency under your charge; that an improved condition in the affairs of the agency will be expected within a reasonable time, both as to methods of doing business and as to the condition of the Indians; that the education and proper training of the Indian children and the agricultural and other industrial pursuits of the adult Indians must receive your constant and careful attention, to the end that they may be advanced in the ways of civilization and to the condition of self-support; and that your commission will be held with the express understanding that you will use your utmost endeavors to further these objects and purposes.

The general purpose of the Government is the preparation of Indian youth for assimilation into the national life by such a course of training as will prepare them for the duties and privileges of American citizenship. This involves the training of the hand in useful industries; the development of the mind in independent and self-directing power of thought; the impartation of useful practical knowledge; the culture of the moral nature, and the formation of character. Skill, intelligence, industry, morality, manhood, and womanhood are the ends aimed at.

Government schools for Indians are divided into five general classes: Reservation day schools, reservation boarding schools of first and second grades, and industrial training schools of first and second grades.

It is the duty and design of the Government to remove, by the shortest method, the ignorance, inability, and fears of the Indians, and to place them on an equality with other races in the United States. In organizing this system of schools, the fact is not overlooked that Indian schools, as such, should be preparatory and temporary; that eventually they will become unnecessary, and a full and free entrance be obtained for Indians into the public school system of the country. To this end all officers and employés of the Indian school service should work.

### Superintendent of Indian Schools

Under the law it is the duty of the Superintendent of Indian Schools—

To visit and inspect the schools in which Indians are taught in whole or in part from appropriations from the United States Treasury, and report to the Commissioner from appropriations from the United States Treasury, and report to the Commissioner of Indian Affairs what, in his judgment, are the defects, if any, in any of them in system, in administration, or in the means for the most effective advancement of the pupils therein toward civilization and self-support, and what changes are needed to remedy such defects as may exist; and to perform such other duties as may be imposed upon him by the Commissioner of Indian Affairs subject to the approval of the Secretary of the Interior.

*Supervisors of Education*

The supervisor of education appointed for a special locality shall visit and inspect the boarding and day schools under his supervision; advise with the teachers, give them instructions in methods of teaching, and report to the Commissioner of Indian Affairs what defects, if any, exist in the schools visited, referring specially to the qualifications and efficiency of each teacher, and the discipline and progress of each school, and shall recommend such measures as in his judgment will improve the condition of the schools and increase the interest of pupils and parents.

## RESERVATION BOARDING SCHOOLS

*Duties of Officers and Employés*

### Agent

1. The agent is the highest authority on the reservation in all matters pertaining to the schools, as well as to other interests of the Indians; but he is not authorized to give directions to school employés regarding their school duties, except through the superintendent.

2. The agent shall have general supervision of all school work among the Indians under his charge. He must visit all schools whether Government, contract, or mission, at least four times each year, keep himself thoroughly informed as to their condition and efficiency, and make quarterly reports concerning the same to the Indian Office.

3. It is the duty of the agent to keep the schools filled with Indian pupils, and, so far as practicable, to place every Indian child of school age in school. He should accomplish this by persuasion, if possible, but, when milder methods fail, he may withhold rations or annuities, or use such other proper means as will produce the desired result.

On reservations where there is more than one school and more than one tribe of Indians there should be in each school pupils from each of the tribes. This will facilitate English speaking by the pupils and tend to overcome the race and tribal prejudices of Indians.

4. It is desirable that an equal number of each sex be kept in school. It is likewise advantageous to the children to enroll them at as early an age as possible; but children under five years of age shall not be enrolled except by permission of the Commissioner of Indian Affairs.

5. The agent is expected to see that the pupils have proper moral, mental, and industrial training; that their physical welfare is properly cared for; that abundant wholesome food, suitable clothing, sufficient fuel, and an ample supply of good water are provided the schools; that sanitary laws and regulations are complied with; that the buildings are properly heated, lighted, and ventilated; that the dormitories are not overcrowded, and that proper medical attendance and supervision are afforded.

6. The agent shall exercise merely an advisory supervision over a bonded school within the limits of his agency jurisdiction, or adjacent thereto. He is

required to cooperate with the superintendent in every way practicable for the general well-being of the school. He shall endeavor to keep the school filled with pupils, and when necessary shall assist with his police force in maintaining order, preventing desertions, and returning runaways, and he shall exert his authority whenever necessary to maintain the discipline or efficiency of the school.

### School Superintendent

7. The superintendent shall have immediate general control of the school. He is responsible for the discipline, the classification of pupils, and the distribution of duties among the employés. His orders must be carried into effect, both in letter and in spirit. He shall act as principal teacher, unless a principal teacher is provided for the school, and in the absence of an industrial teacher, shall have immediate charge of the duties usually belonging to that employé.

8. The superintendent shall arrange a regular program of school-room exercises and industrial work, and assign teachers and employés to their duties in accordance therewith, clearly defining the duties of each. He shall also decide upon the hours of recitation and industrial work for each pupil in the school.

9. The superintendent shall, as occasion may require, hold meetings with his associate teachers and employés for consultation as to the general welfare of the school; shall treat his subordinates with respect, support them in the exercise of proper authority, and ordinarily shall issue orders to individual pupils through those only who have the special care of them.

10. When the superintendent finds it advisable to correct faults of teachers or employés or to call attention to inefficient service or neglect of duty on their part, it must be done at some other time and place than in the presence of pupils. No public reprimand of an employé is permitted.

11. In cases of controversy or want of harmony which the superintendent is unable to settle amicably, appeal may be made to the agent, who shall give a hearing, in his office if practicable, to all parties concerned, and if he shall be unable to restore cordial relations among the school employés, he shall report all the facts to the Indian Office, suspending offenders if the interests of the service require it, pending definite instructions from the Commissioner of Indian Affairs.

12. The superintendent must give close personal attention to every department of the school. He is expected to visit all employés while in the performance of their duties as frequently as may be necessary to ascertain not only the character of work done by them, but to advise them wherein they fail in fidelity, efficiency, or discipline. The industrial work among the boys must have his special attention. He should so supervise this branch of the service as to leave no excuse for neglect upon the part of teachers or pupils.

13. Once each week regularly at a stated hour the superintendent is required to make a personal inspection of the dormitories and infirmaries,

observing the personal appearance and clothing of the pupils, and the condition of the rooms and everything therein. At such time each pupil must be in his own proper place in the dormitory or infirmary. This personal, vital contact, weekly, with every pupil in the school should enable the superintendent to give such advice and direction as will promote the physical, mental, and moral well-being of those under his charge. It should be made with conscientious fidelity and thoroughness.

14. The superintendent must reside in the school buildings, and where practicable, in the boys' department.

15. The superintendent cooperating with the physician and matron must see that all cases of infectious and contagious diseases are isolated, and that toilet articles used by pupils having inflamed eyes, skin diseases, or other such disorders, are not used by other pupils.

16. In cases not covered by these rules the superintendent is expected to use his discretion and judgment, and he may adopt for the administration of the minor affairs of the school a special code of rules, not inconsistent with those herein.

17. The superintendent shall forward all official communications to the Indian Office through the agent. He is especially advised that absolute union of purpose and effort is essential to the efficiency of his school, and he should therefore strive to cooperate heartily with the agent, upon whose support and friendship much of his success must depend.

18. The superintendent shall submit to the Indian Office, through the agent, at the close of each school year, an annual report giving a full history for the year of the school and of each of its departments. He may require that written reports be made to him at the close of the year by the principal teacher, matron, industrial teacher, and other employes.

19. The superintendent of a bonded school on or adjacent to an Indian reservation is independent of the agent, so far as school management, the duties defined in his bond, and department regulations are concerned, but, as already stated, the agent is expected to exercise an advisory supervision of the school and to report to the Indian Office his observations. The success of the school must depend largely upon the cordial coöperation with the agent, and harmonious relations between the superintendent and agent should be maintained.

#### Clerk

20. The clerk of a bonded school, if there be one, shall perform such clerical duties as may be required, and may be assigned to other duties by the superintendent. In small bonded schools the clerk will act as teacher or industrial teacher, or in such other capacity as the superintendent may direct.

#### Physician

21. The school physician shall have oversight of all sanitary matters connected with the school, and in addition to his professional duties shall give the pupils simple, appropriate talks on the elementary principles of physiology and hygiene, explaining the processes of digestion and assimila-

ils, and the
each pupil
mary. This
ould enable
promote the
e. It should

and where

atron must
d, and that
s, or other

expected to
inistration
inconsistent

ions to the
t absolute
ol, and he
pon whose

rough the
ull history
ay require
principal

an Indian
ment, the
rned, but,
rvision of
he success
with the
nd agent

orm such
duties by
eacher or
lent may

matters
ties shall
ciples of
assimila-

tion of food, the circulation of the blood, the functions of the skin, etc., by which they may understand the necessity for proper habits of eating and drinking, for cleanliness, ventilation, and other hygienic conditions. The correct manner of treating emergency cases, such as hemorrhage, fainting, drowning, prostration from heat, etc., should be explained. Classes composed of the most advanced and intelligent pupils should be formed for instruction by the physician in regard to nursing and care of the sick, administering medicines, preparing food for invalids, and any other points of like character on which it would be proper to give such pupils instruction. In the absence of a school physician, these duties will devolve upon the agency physician so far as practicable. A permanent record must be kept of all cases treated by the physician.

### Teachers

22. The principal teacher, under directions from the superintendent, shall have charge of the school-room exercises. He shall arrange classes, define hours of study and recitation, supervise the literary work, teach classes as the superintendent may direct, and perform the duties of any teacher who may be temporarily absent. School-room exercises should occupy about five hours each day, and each pupil should average not less than three hours' work in the school room daily.

23. The duties of each teacher shall be those assigned by the superintendent and principal teacher. Where there is but one teacher he or she shall be secretary of the school and shall keep the school register. Any teacher may be required by the superintendent to assist the clerical work incident to the school.

### Matron

24. The matron shall have charge of the dormitories, see that the beds are properly cared for, that the toilet of the girls is carefully made each morning, that the clothing of both girls and boys is kept in proper condition, and also shall have general oversight of the kitchen and dining room, and all the domestic affairs of the school. With the coöperation of the superintendent she shall see to it that the principal part of the work in the kitchen, laundry, dining room, and sewing room is performed by the girls of the school, who shall be regularly detailed for that purpose. She is expected to reside in the girls' building.

### Industrial Teacher

25. The industrial teacher, under direction of the superintendent, shall attend to all the outside manual labor connected with the school, cultivating thoroughly the school farm and garden, caring for the stock belonging to the school, keeping a supply of fuel on hand, making repairs on buildings, and seeing that the school property and grounds are kept in good order. All such work must be done, with his assistance and supervision, by the boys of the school regularly detailed for that purpose.

### Cook

26. The cook, with the assistance of the pupils, who must be regularly detailed for that purpose, shall prepare all food required for the school,

including such as may be needed by the sick, attend to the setting of the tables, washing of dishes, and cleaning of the lamps each day; see that everything in the kitchen and dining room is kept in proper order, and that the kitchen and dining room are locked at night, and shall be responsible to the superintendent for all the articles in her department.

### Seamstress

27. The seamstress, with the assistance of the girls, must perform all kinds of sewing required, including mending, and must teach the girls to make and mend both their own clothing and that of the boys.

### Laundress

28. The laundress, with the assistance of the girls, must do all the washing and ironing required for the school. If laundering for employés is done in the school, it shall be paid for by them, the pay for the same to be given to the girls and the laundress who perform the service, upon an agreed basis approved by the superintendent.

### Other Employés

29. Mechanics and all other employés not above named shall be assigned their duties by the superintendent, and to the duties usually appertaining to their position the superintendent may add any other duty which the good of the school may require.

30. Some employé must be required by the superintendent, in addition to his regular duties, to have charge of the ringing of bells and keeping time for the school; to see that the boys retire properly; that their clothing and persons are suitably cared for; that they are regularly bathed; that their toilet is neatly made in the morning; and that they are prompt at meals and details; and he shall keep a correct record of absentees.

31. Indians should be employed in preference to whites in positions which they are competent to fill. Every school should have one or more Indians among its employés.

### General Rules

32. Employés are expected to reside in the school buildings when quarters there are provided for them; otherwise, as near to the buildings as practicable. Employés must keep their rooms in order at all times.

33. Employés are not allowed to have pupils in their rooms except by permission of the superintendent for specified reasons.

34. No person, other than an attaché of the school, shall be allowed in any school building later than 9.30 p. m. except by special permission of the superintendent.

35. A retiring bell rung at 9 p. m. (or later during warm weather, if advisable) shall be the signal for absolute quiet in all the dormitories and adjacent rooms.

36. Every night, at irregular periods, some person or persons duly assigned to such duty must "make the rounds," visiting every portion of the school buildings and premises, to guard against fire, prevent intrusion of

tting of the
ry; see that
er, and that
sponsible to

m all kinds
o make and

do all the
employés is
same to be
e, upon an

be assigned
ertaining to
the good of

addition to
eping time
othing and
that their
t meals and

tions which
ore Indians

vhen quar-
uildings as

except by

allowed in
sion of the

veather, if
itories and

ns duly as-
tion of the
itrusion of

unauthorized persons, and detect any improper conduct on the part of pupils or others.

37. Social dancing, card playing, gambling, profanity, and smoking are strictly prohibited in the school buildings and on the premises. Pupils are forbidden to carry concealed weapons.

38. There shall be a session of school each evening for reading, study, singing, or other exercises, at the close of which the pupils shall retire in an orderly manner to their dormitories. The employments for Saturday shall be arranged by the superintendent and matron to the best advantage of the school.

39. The Sabbath must be properly observed. There shall be a Sabbath school or some other suitable service every Sunday, which pupils shall be required to attend. The superintendent may require employés to attend and participate in all the above exercises; but any employé declining as a matter of conscience shall be excused from attending and participating in any or all religious exercises.

40. Every school should be carefully graded and pupils should be classified according to their capacity and scholarship and be promoted from grade to grade under such rules as may be prescribed by the superintendent. At the close of each term pupils should be examined in all the studies pursued during the term and promotions should be made on the basis of these examinations. Pupils who have completed the school course should be reported to the Indian Office for promotion to a school of higher grade.

41. All instruction must be in the English language. Pupils must be compelled to converse with each other in English, and should be properly rebuked or punished for persistent violation of this rule. Every effort should be made to encourage them to abandon their tribal language. To facilitate this work it is essential that all school employés be able to speak English fluently, and that they speak English exclusively to the pupils, and also to each other in the presence of pupils.

42. Instruction in music must be given at all schools. Singing should be a part of the exercises of each school session, and wherever practicable instruction in instrumental music should be given.

43. Except in cases of emergency, pupils shall not be removed from school either by their parents or others, nor shall they be transferred from a Government to a private school without special authority from the Indian Office.

44. The school buildings should be furnished throughout with plain, inexpensive, but substantial furniture. Dormitories or lavatories should be so supplied with necessary toilet articles, such as soap, towels, mirrors, combs, hair, shoe, nail, and tooth brushes, and wisp brooms, as to enable the pupils to form exact habits of personal neatness.

45. Good and healthful provisions must be supplied in abundance; and they must be well cooked and properly placed on the table. A regular bill of fare for each day of the week should be prepared and followed. Meals must

be served regularly and neatly. Pains should be taken not only to have the food healthful and the table attractive, but to have the bill of fare varied. The school farm and dairy should furnish an ample supply of vegetables, fruits, milk, butter, cottage cheese, curds, eggs, and poultry. Coffee and tea should be furnished sparingly; milk is preferable to either, and children can be taught to use it. Pupils must be required to attend meals promptly after proper attention to toilet, and at least one employé must be in the dining room during each meal to supervise the table manners of the pupils and to see that all leave the table at the same time and in good order.

46. The superintendent will establish a common mess for the employés and may prescribe rules governing the same. Their meals may be prepared by the school cook, if such work will not interfere with the proper discharge of her regular duties, and she shall receive from the members of the mess a fair allowance for the extra duty thus imposed upon her, such allowance to be divided among them pro rata; or they may hire a cook who is not a school employé. The matron, under the direction of the superintendent, may have immediate charge of the employés' mess.

47. So far as practicable, a uniform style of clothing for the school should be adopted. Two plain, substantial suits, with extra pair of trousers for each boy, and three neat, well-made dresses for each girl, if kept mended, ought to suffice for week-day wear for one year. For Sunday wear each pupil should be furnished a better suit. The pupils should also be supplied with underwear adapted to the climate, with night clothes, and with handkerchiefs, and, if the climate requires it, with overcoats or cloaks and with overshoes.

48. The buildings, outhouses, fences, and walks should at all times be kept in thorough repair. Where practicable, the grounds should be ornamented with trees, grass, and flowers.

49. There should be a flag staff at every school, and the American flag should be hoisted, in suitable weather, in the morning and lowered at sunset daily.

50. Special hours should be allotted for recreation. Provision should be made for outdoor sports, and the pupils should be encouraged in daily healthful exercise under the eye of a school employé; simple games should also be devised for indoor amusement. They should be taught the sports and games enjoyed by white youth, such as baseball, hopscotch, croquet, marbles, bean bags, dominoes, checkers, logomachy, and other word and letter games, and the use of dissected maps, etc. The girls should be instructed in simple fancy work, knitting, netting, crocheting, different kinds of embroidery, etc.

51. Separate play grounds, as well as sitting rooms, must be assigned the boys and the girls. In play and in work, as far as possible, and in all places except the school room and at meals, they must be kept entirely apart. It should be so arranged, however, that at stated times, under suitable supervision, they may enjoy each other's society; and such occasions should be used

to teach them to show each other due respect and consideration, to behave without restraint, but without familiarity, and to acquire habits of politeness, refinement, and self-possession.

52. New Year's Day, Franchise Day (February 8), Washington's Birthday (February 22), Arbor Day, Decoration Day (May 30), Fourth of July, Thanksgiving Day, and Christmas, are to be appropriately observed as holidays.

53. Corporal punishment must be resorted to only in cases of grave violations of rules, and in no instances shall any person inflict it except under the direction of the superintendent, to whom all serious questions of discipline must be referred. Employés may correct pupils for slight misdemeanors only.

54. Any pupil twelve years of age or over, guilty of persistently using profane or obscene language; of lewd conduct; stubborn insubordination; lying; fighting; wanton destruction of property; theft; or similar misbehavior, may be punished by the superintendent either by inflicting corporal punishment or imprisonment in the guardhouse; but in no case shall any unusual or cruel or degrading punishment be permitted.

55. A permanent record should be kept on file at each school showing the history of each pupil, giving name, age, sex, height, weight, chest measurements, state of health, residence, names of parents, and of tribe to which the family belongs, time of entering and leaving school, and the advancement made in education. If an English name is given to the pupil, the Indian name of the father should be retained as a surname.

### Industrial Work

56. A regular and efficient system of industrial training must be a part of the work of each school. At least half of the time of each boy and girl should be devoted thereto—the work to be of such character that they may be able to apply the knowledge and experience gained, in the locality where they may be expected to reside after leaving school. In pushing forward the school-room training of these boys and girls, teachers, and especially superintendents, must not lose sight of the great necessity for fitting their charges for the every-day life of their after years.

57. A farm and garden, if practicable an orchard also, must be connected with each school, and especial attention must be given to instruction in farming, gardening, dairying, and fruit growing.

58. Every school should have horses, cattle, swine, and poultry, and when practicable, sheep and bees, which the pupils should be taught to care for properly. The boys should look after the stock and milk the cows, and the girls should see to the poultry and the milk.

59. The farm, garden, stock, dairy, kitchen, and shops should be so managed as to make the school as nearly self-sustaining as practicable, not only because Government resources should be as wisely and carefully utilized as private resources would be, but also because thrift and economy

are among the most valuable lessons which can be taught Indians. Waste in any department must not be tolerated.

60. The blacksmith, wheelwright, carpenter, shoemaker, and harness maker trades, being of the most general application, should be taught to a few pupils at every school. Where such mechanics are not provided for the school pupils should, so far as practicable, receive instruction from the agency mechanics.

61. The girls must be systematically trained in every branch of house-keeping and in dairy work; be taught to cut, make, and mend garments for both men and women; and also be taught to nurse and care for the sick. They must be regularly detailed to assist the cook in preparing the food and the laundress in washing and ironing.

62. Special effort must be made to instruct Indian youth in the use and care of tools and implements. They must learn to keep them in order, protect them properly, and use them carefully.

63. Pupils should be detailed to such work as they will probably have to do after leaving school. Neither girls nor boys must be compelled to perform duties unsuitable to their sex, age, or strength. Therefore, except when necessary, boys should not be assigned to ordinary kitchen duties, though they can be very properly required to keep their own dormitories in perfect order. The work should be so arranged as not to be irksome or discouraging. The details of pupils should be so planned that school-room and other duties will not clash; and so that they will know their duties for each hour in the day. While each one should acquire skill in some special line, his work should be varied enough to give him an acquaintance with other branches.

### Removals and Appointments

64. Persons in the Indian school service are engaged with the distinct understanding that character, merit, efficiency, and special qualifications for the work required, are the only considerations upon which they can hope to be retained. Removals will be made for cause, such as immorality, incompetency, indolence, flagrant infirmities of temper, and neglect of or refusal to perform duty, and also for manifest physical disability. An adverse report of any officer of the Department to whom the Indian Office has a right to turn for information regarding the conduct of the schools, shall be sufficient cause for suspension or removal of any school employe. Special investigations will not be ordered at the request of employes dismissed or suspended, but the office will carefully weigh any charges made against employes and take action only after due deliberation.

65. When an agent is of the opinion that the superintendent or any other school employe is not a fit person for the place he holds, or is not adapted to perform its duties, the agent must make written report of the fact to the Commissioner, stating specifically his reasons for his opinion. And when the superintendent of any Government school is of the opinion that any

employé thereof is not efficient, or is not adapted to the work required of him, it shall be the duty of said superintendent to report the fact in writing to the agent, stating specifically his reasons for the opinion. The agent must forward this report to the Commissioner, with such recommendations in relation thereto as he may deem it his duty to make.

65a. The agent shall not suspend any superintendent or other school employé without authority first obtained from the Commissioner, except when the moral welfare or the discipline of the school imperatively demands summary action, in which case he may suspend such employé and select a competent person to perform his duties temporarily, reporting immediately to the Commissioner full and specific reasons for the action taken.

65b. All positions and salaries expire June 30 of each year, and all appointments are made with this understanding. Therefore the Indian Office is not committed to any employé beyond the date named; but the office aims to retain competent and satisfactory employés from year to year, if the positions in which they are employed are continued, and whenever practicable to promote to higher grades those who have distinguished themselves by devotion to duty or special aptitude.

66. Many of the school employés will naturally and properly be nominated by the agent, though the Indian Office reserves the right to appoint or remove all employés. In making selection of school employés the agent should in all cases consult with the superintendent and, if possible, act in harmony with him. Care must be taken to secure persons of proper qualifications, good moral character, special fitness for the duties to be performed, and those who are able to speak the English language fluently and correctly. Personal and political considerations should not enter into the question. For teachers men and women especially trained for their work, with experience in teaching in public schools, who have been educated in American schools, should be given the preference. A certificate to teach in some State or Territorial school, or a normal school diploma, should accompany a recommendation for appointment as teacher or superintendent. In transmitting nominations the agent must forward at the same time evidences of the qualifications of proposed employés.

67. While no test of religious faith or affiliations shall be applied in the appointment of persons in the Indian school service or in their removal therefrom, yet every employé is required to have a decent respect for religion and to be of good moral character. In addition to recognized efficiency and general usefulness, a character which Indian children can imitate to advantage is also essential. Profanity, obscenity, indifference to moral restraints, and infirmities of temper can not be tolerated. Men and women in the Indian-school service are expected to be models of our Christian civilization, and if guilty of conduct which shocks the moral sense of a civilized community they will be summarily discharged.

68. Finally, employés at Government boarding schools must understand

when they accept appointment that hard work is to be performed; that long hours of service are required; that in the nature of things every employé must be willing to work night or day if special emergencies arise; that the duties of an employé do not end arbitrarily at a given hour, but may be continued indefinitely; and it must be understood by any individual entering the service that additional duties, or duties entirely different from those usually attaching to the position to which he or she is regularly assigned, may be required. There is no room for shirks or unwilling workers in the Indian-school service, and the man or woman who is too fastidious to assist in making a camp Indian child or youth tidy in appearance; too indifferent to participate in the general exercises of the school; too obstinate to yield to the judgment of those charged with directing the school work, should not enter it, for efficiency and success can come only to those who are interested in the education of the Indian, physically able for the arduous duties to be performed, and, above all else, willing to do whatever is necessary for the good of all concerned.

---

### TRAINING SCHOOLS

69. Superintendents of industrial training schools report to the Commissioner of Indian Affairs direct. They have entire control of schools under their charge, subject to the regulations of the Indian Office and special instructions of the Commissioner of Indian Affairs. As bonded officers they are responsible for all Government property under their charge. They are authorized to establish such special regulations regarding the details of their school work as circumstances may require; to determine the duties of all employes; to direct the work of the school in all its departments; to administer discipline; to be accountable for money earned by pupils, and to prescribe rules governing its expenditure by pupils, and in general to manage the affairs of the institution; but they shall neither nullify nor modify any order of the Indian Office nor any of the general regulations governing Indian schools, except by permission of the Commissioner of Indian Affairs.

### DAY SCHOOLS

70. The day schools on each reservation are under the immediate control of the agent. Where there is no supervisor the agent is required to visit each school at least once in two months. He shall see that proper school furniture and appliances, and an abundance of fuel and good water are provided, and contribute in every way possible to the efficiency of the schools. He will report from time to time with regard to the character of the work done at each school, and the efficiency of each teacher. He will spare no reasonable efforts to keep the schools filled with Indian pupils, and strive to unite

ied; that long
very employé
rise; that the
, but may be
vidual enter-
it from those
irly assigned,
orkers in the
ious to assist
o indifferent
te to yield to
, should not
e interested
duties to be
isary for the


he Commis-
100ls under
and special
officers they
e. They are
ails of their
uties of all
tments; to
oils, and to
general to
1ullify nor
egulations
issioner of


te control
visit each
furniture
provided,
s. He will
k done at
easonable
to unite

teachers, agency employés, and parents in a common interest in their welfare.

71. The supervisor of day schools upon any reservation shall be constantly in the field visiting schools, teachers, and parents, directing the details of the work, consulting with the teachers, urging parents to send their children to the schools, and performing such other duties in connection with the schools as the Commissioner of Indian Affairs or the agent may direct. He shall report weekly to the agent, and on the last day of each month shall transmit to the Indian Office, through the agent, a report of the work for the month, making recommendations relative thereto.

72. Each teacher will be expected to classify pupils, so far as practicable according to the prescribed course of study.

73. Each teacher must prepare and follow a regular program of exercises, interspersing study and recitations with singing, calisthenics, and intermissions. As most day-school work will be of a primary grade, instructions will be given by slate, blackboard and chart exercises, object lessons and picture talks in English more than by the use of text books. The teacher is expect to stimulate and encourage pupils, and must therefore give to her school intelligent, earnest attention, and use skill and ingenuity in adapting usual methods to the instruction of children who must acquire the language in which they are taught.

74. A session of a day school is five and one-half hours, exclusive of intermissions. A session begins at 9 o'clock and continues until 4 p. m., unless otherwise authorized, with two intermissions of fifteen minutes each, and one of one hour. Sessions must be held on each day of the week, Saturdays, Sundays, and legal holidays excepted.

75. Corporal punishment is allowed only in cases of gravest misconduct, and must never be inflicted by one pupil upon another at the instance or request of the teacher.

76. School rooms are under the control of the teacher, who is authorized to detail pupils to care for the same, but the agent is responsible for the buildings and public property therein. If there be an assistant teacher the assistant shall have supervision of this part of the school work, and shall perform such other school duties as may be assigned by the teacher. The assistant teacher shall not be required to perform personal service for the teacher.

77. So far as practicable a man and wife shall be employed as teacher and assistant teacher, and where they are so employed they shall arrange the school-room work so as to combine industrial training with the study of books, the man teaching industries to the boys and the woman to the girls, the object being to fit each sex for the duties likely to be incumbent upon them in after life. Even where there is but one teacher some industrial training is possible and should be included in the course of instruction.

78. The day-school teacher, being frequently the only white person in an

Indian camp, is expected to be exemplary in conduct and character, and if otherwise can not be continued in service.

79. All the preceding rules relating to boarding schools, the conduct of school employés, and their relations to the agent, shall be in force at day schools so far as applicable.

## LEAVES OF ABSENCE

### Boarding Schools

1. All positions and salaries in the Indian-school service terminate absolutely June 30 of each year.

2. Should any position not be authorized for the ensuing fiscal year, the incumbent of such position is of course relieved from duty June 30, and has no claim against the Government for remuneration after that period.

3. No employé can claim leave of absence with pay as a matter of right, as there is no law regulating the matter. Such leaves are regulated by the Commissioner of Indian Affairs, under instructions from the Secretary of the Interior, according to the best interests of the service, and they are allowed only for good reasons, not as a matter of course.

4. Leaves of absence are to be taken when the services of employés can be spared with least detriment to the interests of the school.

5. Leaves of absence are, whether from sickness or other causes, during the school year, will be granted upon direction of the Secretary of the Interior by the Commissioner of Indian Affairs only.

6. Leaves of absence during the months when the school is in vacation are authorized in the discretion of the agent or (in the case of a bonded school) the superintendent, such leaves not to exceed three days for each month of service, nor to exceed thirty days in any fiscal year. The time of granting these leaves is left to the agent or superintendent, who will so arrange the same that the necessary work of the schools may be continued through the vacation. If, for instance, the employé entered upon duty October 1 and was in continuous service until June 30 following, his continuous service represents nine months, and consequently he may be granted nine times three days' leave with pay, which is twenty-seven days' leave. Ten or more months' service would give thirty days' leave, the annual limit.

7. Agents and superintendents of bonded schools are cautioned against favoritism in the granting of leaves of absence, and at proper times they must report fully the dates of leaves granted under these regulations. Leaves granted to employés in advance of the receipt of information as to what positions will be authorized during the next fiscal year must be granted with the explicit understanding that should the services of such employés terminate for any cause prior to the expiration of such leaves, the leaves would expire with the termination of service.

### Day Schools

3. Beginning July 1, 1891, the school year for day schools will be ten